# United States District Court

### For the

## Western District of New York



ZAKKIYYA CARTER, as Pro Se )
)                 COMPLAINT
    Plaintiff )                 42 U.S.C. 1983  25  CV  740-S
)                 Docket No. _____
)
    -V- )
)
CITY OF BUFFALO,
JANE AND JOHN DOES, MIA SULLIVAN,
JENNIFER HUBACHER, ASHLEY WACZKOWSKI
DAWN  FREEMAN, SUICIDE PREVENTION AND CRISIS SERVICES INC
LAURA HANRAHAN, MD, UNIQUE OUTLAW
JONES, MD REBECCA HICKS, MD,
MARKEITH PRIDGOEN, JULIA RINGLE, MD,
LAURA FLEMING, JANE AND JOHN DOES,
ERIE COUNTY MEDICAL CENTER
ERIE COUNTY MEDICAL  CENTER COPORATION
NICOLE ABRUZZINO, PAULA FEROLETO,
SAMANTH VENTURA, JANE AND JOHN DOES,
ALICIA FLOOD and SHALONNA WATTS

**ALL IN THEIR OFFICIAL AND UNOFFICIAL CAPACITIES**


### PLAINTIFF'S PARTY INFORMATION

1.    Plaintiff ZAKKIYYA CARTER resides at 280 Stevens  Avenue, Buffalo, New York 14215,

located in Erie County and the State of New York.


### DEFENDANTS PARTIES INFORMATION

2.     Upon information and belief, the CITY OF BUFFALO is a municipal corporation duly organized and existing under and pursuant to the laws of the State of New York. The City of Buffalo has a principal place of business at 65 Court Street, Buffalo New York 14202.

3.     City of Buffalo E-District Police Officer JOHN DOE is employed by the City of Buffalo and was acting in such capacity during the events which give rise to this lawsuit.

4.     City of Buffalo E-District Police Officer JOHN DOE is employed by the City of Buffalo and was acting in such capacity during the events which give rise to this lawsuit.

5.     City of Buffalo E-District Police Officer JOHN DOE is employed by the City of Buffalo and was acting in such capacity during the events which give rise to this lawsuit.

6.     Upon information and belief, SUICIDE INTERVENTION AND CRISIS SERVICES INC, mentioned herein after as "CRISIS SERVICES" is a nonprofit organization were created and existed as a form of intervention and support for individuals experiencing mental health crisis or other emergencies, duly organized to the County of Erie and existing under and pursuant to the laws of the State of New York. SUICIDE INTERVENTION AND CRISIS SERVICES INC  has a principal place of business at 100 River Rock Rd, STE 300, Buffalo New York 14207.

7.     Crisis Services MIA SULLIVAN is a licensed social worker, agent, servant, representatives, and or employee, at all times here relevant employed by Suicide Intervention and Crisis Services Inc, mentioned herein after as "CRISIS SERVICES" and was acting in such capacity during the events which give rise to this lawsuit.

8.     Crisis Services JENNIFER HUBACHER is a licensed social worker, agent, servant, representatives, and or employee, at all times here relevant employed by Suicide Intervention and Crisis Services Inc, mentioned herein after as "CRISIS SERVICES" and was acting in such capacity during the events which give rise to this lawsuit.

9.      Crisis Services ASHLEY WACZKOWSKI  is a licensed social worker, agent, servant, representatives, and or employee, at all times here relevant employed by Suicide Intervention and Crisis Services Inc, mentioned herein after as "CRISIS SERVICES" and was acting in such capacity during the events which give rise to this lawsuit.

10.     Crisis Services DAWN FREEMAN is a licensed social worker, agent, servant, representatives, and or employee, at all times here relevant employed by Suicide Intervention and Crisis Services Inc, mentioned herein after as "CRISIS SERVICES" and was acting in such capacity during the events which give rise to this lawsuit.

11.     Upon information and belief, ALICIA FLOOD is a private citizen, actor in concert, and or accomplice to JOHN DOE'S, CRISIS SERVICES and NICOLE ABRUZZINO and was acting in such capacity during the events which give rise to this lawsuit. ALICIA FLOOD has a address or last known address of 202 Summit Avenue, Buffalo New York, 14214. ALICIA FLOOD has a principal place of business and is directly employed at Clinical Staffing Resources, with the nearest principal address of 420 Broadway, Floor 3, Brooklyn New York 11211.

12.     Upon information and belief, SHALONNA WATTS is a private citizen, actor in concert, and or accomplice to JOHN DOE'S and CRISIS SERVICES and was acting in such capacity during the events which give rise to this lawsuit. SHALONNA WATTS has a last known address of 630 Staring street, Buffalo New York 14216 and 413 Northumberland, Buffalo, New York 14215.

13.     Upon information and belief, ERIE COUNTY MEDICAL CENTER and/or ERIE COUNTY MEDICAL CENTER  CORPORATION, mentioned herein after as ECMCC is a municipal corporation duly organized and existing under and pursuant to the laws of the State of

New York. ECMCC has a principal place of business at 462 Grider Street, Buffalo, New York 14215.

14.     ECMCC LAURA HANRAHAN is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

15.     ECMCC UNIQUES OUTLAW JONES is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

16.     ECMCC REBECCA HICKS is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

17.     ECMCC MARKEITH PRIDGOEN is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

18.     ECMCC LAURA FLEMING is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

19.     ECMCC JOHN AND JANE DOE'S is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to this lawsuit.

20.     ECMCC JULIA RINGLE is employed by ERIE COUNTY MEDICAL CENTER/CORPORATION and was acting in such capacity during the events which give rise to

this lawsuit. JULIA RINGLE also has a principal place of business at 1050 Niagara Street, Buffalo, New York 14213.

21.    Mental Hygiene Legal Services (MHLS) attorney SAMANTHA VENTURA is employed by Erie County Bar Association and/or Mental Hygiene Legal Services and was acting in such capacity during the events which give rise to this lawsuit. SAMANTHA VENTURA has a principal place of business at 438 Main Street, STE 400, Buffalo, New York 14202.

22.    Supreme Court justice PAULA L, FEROLETO is a Supreme Court Justice who has taken an oath to uphold the constitution and protect the rights of citizens and was acting in such capacity during the events which give rise to this lawsuit. PAULA L, FEROLETO has a principal place of business at 25 Delaware, Buffalo, New York 14202.

23.    Upon information and belief ECMCC, Erie County Child and Family Services and or County of Erie is a municipality, in which NICOLE ABRUZZINO was employed by and was acting such capacity during the events which give rise to this lawsuit. NICOLE ABRUZZINO has a principal place of business at 2875 Union Rd, Cheektowaga New York 14227 or ECMCC 462 Grider Street, Buffalo New York 14215.

## COMPLAINT AND DEMAND FOR JURY TRIAL

24.    Plaintiff, ZAKKIYYA CARTER, brings this action against Defendants/ CITY OF BUFFALO et al., and alleges, upon information and belief, the record of previous proceedings, firsthand knowledge, *inter alia*, and hereby submits the following for consideration by this honorable Court and demands a trial by Jury.

## APPLICATION OF LIBERAL CONSTRUCTION

25.     Plaintiff ZAKKIYYA CARTER appears here in her pro se status. As such, this Plaintiff respectfully requests that her pleadings herein will be liberally construed by this honorable Court, pursuant to the standards established by the Supreme Court of the United States in Haines v. Kerner, 404 U.S. 519 (1972) (Holding that: " a pro se litigant's pleadings, "however in artfully pleaded," are held to the most liberal of standards because pro se litigants may be less capable of formulating legally-competent initial pleadings.)

## JURISDICTIONAL STATEMENT

26.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983, 1985(3), and 1988. Plaintiff asserts violations of her rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

27.     The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3), which provides for jurisdiction over civil actions to redress the deprivation of rights secured by the Constitution by persons acting under color of state law.

28.     To the extent Plaintiff asserts related state law claims including false imprisonment, negligence, defamation, and intentional infliction of emotional distress, this Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a), as they form part of the same case or controversy under Article III of the United States Constitution.

29.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Erie County, New York, within the Western District of New York.

30.      Plaintiff does not seek review of any state court judgment but rather seeks redress for

original constitutional violations and conspiracy claims that arose independently of any prior

judicial proceeding.


## PRELIMINARY INTRODUCTION

31.      This is a civil action brought under 42 U.S.C. §§ 1983, 1985(3), and 1988, and the

Fourth and Fourteenth Amendments to the United States Constitution, seeking redress for

unlawful seizure, involuntary psychiatric confinement, denial of due process, and conspiracy to

deprive Plaintiff ZAKKIYYA CARTER of her civil rights. Plaintiff further alleges intentional

acts of retaliation for engaging in constitutionally protected activity. The unlawful conduct was

perpetrated by both government officials and private individuals acting jointly under color of

law. Plaintiff seeks compensatory and punitive damages, injunctive relief, and such other relief

as the Court deems just and proper.

## BACKGROUND CONTEXT: Retaliation and Escalation

32.      On July 7, 2022, Plaintiff CARTER was diagnosed with mold exposure and

hypokalemia stemming from hazardous living conditions in her former residence. After notifying

her landlord, Kapil Verma of VAASTU ENERGY LLC, and threatening legal action, she was

shortly thereafter contacted by Towne Housing Real Estate Agency, a third-party property

management company who had no legal authority over the property during the relevant period.

Towne Housing began issuing threats of eviction, invading Plaintiff's privacy, and engaging in

harassing conduct.

33.      After Plaintiff escalated her complaints and threatened legal action against Towne

Housing as well, the retaliation intensified markedly. Plaintiff began experiencing coordinated

acts of intimidation, including mail tampering, burglary, theft, unlawful planting of contraband, computer crimes, and organized stalking. This retaliatory campaign soon expanded to include unconstitutional interference and unlawful contact by multiple actors and agencies, including the Buffalo Police Department, Erie County Child Protection Services, Crisis Services, ECMCC, Buffalo City Court, the United States Postal Service (Central Park facility), and Erie County Family Court. Notably, in August 2022 alone, Plaintiff endured four separate harassing encounters with E-District officers, including an unlawfully initiated DWI charge that she successfully defeated in court after over two years of litigation, pursuant to ***People v. Ingle*, 36 N.Y.2d 413 (1975).**

The breadth, persistence, and coordination of these retaliatory actions constitute a pattern of conduct consistent with a racketeering scheme in violation of 18 U.S.C. § 1962(c). Plaintiff had made multiple police reports to E-District before and after concerning events, including complaints concerning stalking, computer crimes, burglary, theft, and harassment, beginning in late July 2022. Despite having documentary evidence and identifying suspects, none of Plaintiff's reports were meaningfully investigated to this day. Additionally, Plaintiff sought an order of protection against specific individuals affiliated with Towne Housing Real Estate, which was denied, despite the fact that the company had no lawful or contractual authority over the subject premises during the relevant period.

## FACTUAL ALLEGATIONS TO CLAIM ONE

34.       On August 29, 2022, during daylight hours, the Plaintiff's adversary of over two years, Defendant ALICIA FLOOD, and her distant acquaintance during the relevant period, Defendant SHALONNA WATTS, unlawfully acquired the Plaintiff's phone number without consent.

35.     The Defendants persistently invaded the Plaintiff's privacy by repeatedly calling her phone despite explicit requests to cease communication. This behavior constituted harassment and demonstrated a disregard for the Plaintiff's autonomy and well-being.

36.     Defendants FLOOD and WATTS then unlawfully obtained the Plaintiff's exact physical location at 599 Highgate Avenue, Buffalo, New York.

37.     The Defendants proceeded to engage in a deliberate and repeated course of conduct that amounted to stalking and harassment. They circled the Plaintiff's vicinity several times, instilling fear and concern for her personal safety.

38.     As night fell, Defendants trespassed onto the Plaintiff's premises by exiting their vehicle and initiating an aggressive verbal confrontation. The Plaintiff, the lawful leaseholder of the premises, or any authorized party had not invited, summoned, or provided the address to either Defendant.

39.     The Plaintiff, faced with an escalating and unauthorized intrusion, engaged in verbal self-defense, confronting the Defendants about their actions, including the unauthorized acquisition of her phone number, location, and motives.

40.     Shortly thereafter, the father of the Plaintiff's son arrived at the scene. Upon later discovery, it was disclosed that Defendant FLOOD had contacted him indirectly via his significant other, who worked at the same agency as FLOOD.

41.     Defendant FLOOD, without legal authority, summoned this individual to the Plaintiff's premises location, further escalating the situation and causing additional emotional harm to the Plaintiff.

42.     Soon after the verbal confrontation escalated, JOHN DOE officers arrived at the scene, followed closely by representatives of defendants CRISIS SERVICES.

43.    The Plaintiff repeats and reiterates that neither she, the lawful leaseholder of the home,

nor any authorized individual at the incident location, summoned or invited Defendants JOHN

DOES or CRISIS SERVICES to the incident location for emergency assistance on behalf of the

plaintiff.

44.    Upon their arrival, Defendant FLOOD openly stated to defendant JOHN DOE

officers that she had contacted them. However, no emergency call record was associated with her

contact information, as confirmed through the Buffalo Police Department Complaint List and

Crisis Services call logs obtained via FOIL and discovery.

45.    Defendant FLOOD and Defendant WATTS displayed visible familiarity with

CRISIS SERVICES staff at the scene. Despite this, neither was listed as the official "Requesting

Party" on any documentation. Instead, a fictitious name "Kiesha" was used, further supporting

Plaintiff's contention of a coordinated and premeditated conspiracy.

46.    Defendants FLOOD and WATTS made false and malicious claims to defendants

CRISIS SERVICES and JOHN DOE E-District officers, as captured on body-worn camera

footage. Defendant FLOOD reported receiving a phone call earlier that day from an unnamed

third party, alleging Plaintiff was seen standing under a tree in a rainstorm drinking with her son.

47.    Plaintiff contends that Defendants FLOOD and WATTS knowingly provided false

allegations of erratic behavior and mental illness, based solely on third-party hearsay and

unverifiable observations. Notably, weather reports confirm that the day in question was hot,

sunny, and dry, contradicting the fabricated narrative. CRISIS SERVICES and JOHN DOE

officers failed to question or corroborate the claims. FLOOD and WATTS also defamed

Plaintiff's late biological mother by falsely attributing a mental illness history to her without any

factual basis. These defamatory and false claims, accepted without scrutiny, reflect a

premeditated and collaborative effort by all involved to deprive Plaintiff of her liberty under false pretenses.

48.    Plaintiff had not communicated with Defendant FLOOD since February 20, 2020, nor with Defendant WATTS since July 6, 2022, further establishing that neither had any recent or credible basis to assess Plaintiff's mental health.

49.    Shortly thereafter, Plaintiff was threatened with arrest by defendant JOHN DOE officers unless she complied with transportation to ECMCC for a psychiatric evaluation when she didn't consent. The transport was conducted under Mental Hygiene Law § 9.45 and facilitated by defendants CRISIS SERVICES. Plaintiff was transported to the hospital by police cruiser.

50.    The transport occurred in the absence of a valid removal order, warrant, investigation, or any documented authority granting jurisdiction. At no point did Defendants CRISIS SERVICES perform an initial mental health assessment, engage with the Plaintiff, or inform her of the source or nature of the allegations prompting the intervention. No emergency medical technician (EMT), clinician, or other qualified professional was present to evaluate the Plaintiff in accordance with Mental Hygiene Law § 9.45.

51.    Despite this, the Plaintiff exhibited multiple periods of calm and non-threatening behavior at the scene. CRISIS SERVICES had ample opportunity to conduct an on-site assessment or verify the credibility of the third-party information but chose not to. Their conscious decision to forgo any clinical inquiry or engagement with the Plaintiff reflects a reckless disregard for statutory requirements and a willful deprivation of Plaintiff's liberty without due process.

52.      The plaintiff, age 35 at the time, had no verified diagnosis of a qualifying "mental illness" under Mental Hygiene Law § 1.03(20), no psychiatric treatment history, and no documentation in the New York State Office of Mental Health database warranting involuntary psychiatric care.

53.      In addition, Plaintiff further asserts, defendants FLOOD, WATTS, and the fabricated entity, "Kiesha" and/or CRISIS SERVICES was not identified as the parent, adult sibling, spouse, or child to the plaintiff, the committee or legal guardian to the plaintiff, a licensed psychologist, registered professional nurse or certified social worker that was currently responsible for providing treatment services to the plaintiff, that would have gave them the requisite authority to request for the plaintiff's removal.

54.      In highlight of the incident, CRISIS SERVICES failed to conduct any independent evaluation, ask clarifying questions, or verify the credibility of allegations from FLOOD and WATTS, individuals with no standing under law. CRISIS SERVICES staff never approached or identified themselves to Plaintiff and failed to initiate any de-escalation. Plaintiff only later discovered their identity through independent resources. This absence of professional diligence reflects a reckless disregard for Plaintiff's statutory and constitutional rights.

55.      Plaintiff was unlawfully deprived of her liberty under Mental Hygiene Law § 9.45, despite not meeting the statutory criteria for involuntary psychiatric transport. She had no qualifying mental health diagnosis, and no individual on scene, nor any named requesting party was legally authorized to initiate such intervention. The arrest lacked probable cause and was based solely on hearsay from unqualified individuals. As held in *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016), mere irritability or uncooperative behavior does not establish dangerousness or justify involuntary commitment.

56.      Upon information and belief, Defendants CRISIS SERVICES were already present at

the scene prior to the arrival of Defendants FLOOD and WATTS and had direct observation of

these individuals trespassing onto private premises where plaintiff was located and initiating an

ambush-style confrontation. Despite witnessing this unlawful conduct unfold in real time,

CRISIS SERVICES made no attempt to intervene, defuse the encounter, or investigate the source

or credibility of the allegations later used to justify Plaintiff's involuntary transport. Their

decision to take no action, while simultaneously relying on unverified hearsay from unqualified

third parties reflected not only a reckless disregard for Plaintiff's liberty interests but supports

Plaintiff's contention that the seizure was premeditated and executed under false pretenses,

absent any legitimate mental health concern or clinical necessity.

57.      Following plaintiff's discharge from ECMCC, the Plaintiff executed medical release

authorizations to CRISIS SERVICES on or around November 8, 2022, and again in January

2023. These requests were made to obtain access to the Client Overview and Narrative reports in

order to investigate the circumstances surrounding her involuntary transport and confinement.

58.      Plaintiff initiated these inquiries after CRISIS SERVICES and ECMCC physicians

failed to secure her informed consent or provide a lawful explanation for the transport and

subsequent detention. Upon receiving and reviewing these internal records, Plaintiff discovered

that CRISIS SERVICES had knowingly and willfully manufactured materially false information

regarding her behavior, mental health status, and conduct, including at ECMCC's triage unit.

59.      Defendants CRISIS SERVICES falsely described plaintiff as agitated, delusional,

and suffering from bipolar disorder, and further alleging without evidence that she threatened to

shoot friends or family members. Notably, the alleged threats were purportedly directed at

"Kiesha," a fictitious individual, and Defendant FLOOD, whom CRISIS SERVICES

misleadingly labeled both these individuals as a cousin and family member. These claims were wholly illogical and factually impossible, especially given that "Kiesha" did not exist, nor was on the scene. The fabricated narrative was entirely inconsistent with contemporaneous Body Worn Camera footage and Plaintiff's longstanding medical history.

60.     The plaintiff contends, these coordinated actions of Defendants FLOOD, WATTS, CRISIS SERVICES, JOHN DOES, and the unidentified and identified external parties involved represent a deliberate and unlawful conspiracy to deprive the Plaintiff of her liberty under false pretenses and in the absence of lawful authority.

61.     These acts constitute violations of the Plaintiff's constitutional rights and support claims under 42 U.S.C. § 1983, as well as federal criminal statutes including 18 U.S.C. § 241 (conspiracy against rights) and § 242 (deprivation of rights under color of law). The named actors operated in joint participation and with shared intent, effectuating an unlawful restraint of liberty without probable cause, medical necessity, or authorization from a qualified party, thereby stripping the Plaintiff of her autonomy and civil protections afforded under state and federal law.

62.     These events did not occur in isolation but formed part of a broader, coordinated campaign of retaliation against Plaintiff in connection with her whistleblowing activities concerning hazardous housing conditions and misconduct by state-associated agencies. These falsified records and fabricated identities were not mere administrative errors but rather constituted overt acts in furtherance of the underlying conspiracy, carried out after the initial deprivation of liberty to justify and conceal the unlawful conduct already set in motion.

**DEFENDANTS ACTION UNDER COLOR OF STATE LAW**
**(Application of Joint Action Doctrine against defendants CRISIS SERVICES, FLOOD and WATTS)**

63.      Although Defendants FLOOD and WATTS are private individuals, they knowingly and willfully acted in concert with state actors, namely, Defendants JOHN DOE officers and CRISIS SERVICES personnel to effectuate the unlawful seizure, transport, and psychiatric detention of Plaintiff in violation of her constitutional rights.

64.      It is well-settled that private individuals may be held liable under 42 U.S.C. § 1983 where they are "willful participant[s] in joint activity with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42 (1982). Further, liability may attach where private actors assume functions traditionally exclusively reserved to the state or otherwise invoke state power. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001). See also *Edwards v. City of New York*, 2011 WL 3837098, at \*8 (S.D.N.Y. Aug. 29, 2011) (a private party who conspires with police or procures a false arrest acts under color of state law for § 1983 purposes).

65.      In the Second Circuit, courts have held that "a private party may be held liable under § 1983 if they instigated, encouraged, or participated in a conspiracy to violate a plaintiff's constitutional rights." See *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 A.D.2d 967, 592 N.Y.S.2d 340 (3d Dep't 1993); *Barrows v. Warnecke*, 2021 WL 4429784, at \*5 (S.D.N.Y. Sept. 27, 2021). The facts pled herein clearly meet and exceed this threshold.

66.      Specifically, Defendants FLOOD and WATTS: (a) engaged in aggravated harassment and stalking of Plaintiff by repeatedly targeting her through unwanted contact, surveillance, and trespass; (b) unlawfully ambushed Plaintiff at her residence and provoked an emotionally charged confrontation; and (c) deliberately misrepresented themselves as concerned relatives to induce an involuntary psychiatric seizure based on fabricated mental health claims.

These acts were calculated to trigger police intervention and simulate a mental health emergency for retaliatory and malicious purposes.

67.         CRISIS SERVICES, a designated crisis intervention authority operating under governmental mandate, acted under color of law in adopting and advancing this false narrative. Without conducting any independent assessment, verifying allegations, or consulting a qualified mental health professional, Crisis Services initiated Plaintiff's involuntary transport under Mental Hygiene Law § 9.45. This decision, premised entirely on unverified hearsay and a knowingly falsified emergency, led directly to Plaintiff's unconstitutional detention at ECMCC.

68.         As further recognized in ***Burlington v. Josephson***, **153 F.2d 372, 276 (1946)**, a defendant need not personally execute an arrest to be held liable for false imprisonment, liability attaches where they "affirmatively instigated, encouraged, incited, or caused the arrest or imprisonment." Defendants FLOOD, WATTS, and CRISIS SERVICES all played such roles.

69.         These coordinated actions were not isolated or spontaneous. They were premeditated and executed during a period in which Plaintiff was actively engaged in First Amendment-protected activity, including reporting unsafe housing conditions, filing formal complaints against public agencies, and threatening legal action. The timing and collaborative execution of the mental health seizure reflect retaliatory intent to undermine Plaintiff's credibility and silence her through punitive psychiatric intervention.

70.         As such, all defendants acted jointly and in concert to effectuate an unlawful deprivation of liberty under false pretenses. Each is therefore liable under 42 U.S.C. § 1983 for engaging in joint action under color of state law. Their actions also support the imposition of liability under federal criminal civil rights statutes, specifically 18 U.S.C. § 241 (conspiracy

against rights) and § 242 (deprivation of rights under color of law), for their role in violating

Plaintiff's constitutional protections through a coordinated abuse of authority.

## First Cause of Action for Violation of the Fourth Amendment as per 42 U.S.C. §1983 for the False Imprisonment and/or Unlawful Seizure of Plaintiff of constitutional rights by Defendants City of Buffalo Police Officers JOHN DOES and CRISIS SERVICES.

71.    Plaintiff repeats and realleges each and every allegation contained in the preceding

paragraphs of this Complaint as if fully set forth herein.

72.    The Fourth Amendment of the United States Constitution, applicable to the states

through the Fourteenth Amendment, prohibits unreasonable searches and seizures. Under 42

U.S.C. § 1983, individuals may bring a civil action against any person acting under color of state

law who deprives them of these constitutional rights.

73.    To state a claim for false arrest or unlawful seizure, Plaintiff must allege: (1) the

Defendants intended to confine her; (2) she was conscious of the confinement; (3) she did not

consent to the confinement; and (4) the confinement was not otherwise privileged. See *Singer v.

Fulton County Sheriff*, **63 F.3d 110, 118 (2d Cir. 1995).**

74.    On August 29, 2022, Plaintiff was unlawfully detained and transported to ECMCC

by Defendants JOHN DOE Officers and CRISIS SERVICES, acting in concert, despite lacking

any lawful authority, removal order, warrant, or exigent circumstances to justify such action.

75.    Defendants intended to confine Plaintiff, as demonstrated by their threats of arrest if

she did not comply with the transport, and the actual physical transportation via police cruiser of

Plaintiff to a psychiatric facility against her will.

76.      Plaintiff was fully conscious of her involuntary seizure, did not consent to being

taken into custody, and was never informed of the basis for her detention.

77.      The confinement lacked legal justification, as Plaintiff did not meet the statutory

criteria for involuntary removal under New York Mental Hygiene Law § 9.45. See *Glass v.*

*Mayas*, **984 F.2d 55, 58 (2d Cir. 1993)** (seizure for mental health evaluation must be supported

by probable cause to believe the individual is a danger to themselves or others).

78.      Defendants CRISIS SERVICES relied not only on unverified hearsay from

unqualified third parties including false statements attributed to a fictitious individual, notably

"Kiesha" but also actively manufactured materially false information to support the unlawful

seizure. Without performing any on-site evaluation, CRISIS SERVICES falsely reported that

Plaintiff suffered from bipolar disorder, failed to take prescribed medication, and had threatened

to shoot friends or family members, *inter alia*, claims wholly inconsistent with contemporaneous

body-worn camera footage and Plaintiff's established medical history. Defendants JOHN DOE

Officers effectuated the transport solely on CRISIS SERVICES' unsupported and fabricated

assertions, without independent inquiry or lawful basis.

79.      This warrantless seizure and transport constituted an arrest without probable

cause in violation of clearly established Fourth Amendment protections. See *Zalaski v. City of*

*Bridgeport Police Dept.*, **613 F.3d 336, 340 (2d Cir. 2010).**

80.      As a direct and proximate result of the conduct of Defendants JOHN DOE

Officers and CRISIS SERVICES, Plaintiff suffered deprivation of liberty, emotional trauma,

reputational harm, prolonged illegal detention, and other compensable injuries.

81.         Defendants' actions were intentional, willful, and demonstrated a reckless disregard

for Plaintiff's constitutional rights. Plaintiff seeks compensatory and punitive damages, as well

as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Second Cause Of Action for violation of the Fourteenth Amendment as per 42 U.S.C § 1985**

**(3) of the Plaintiff for Conspiracy to Deprive her of her Civil Rights against defendants**

**City of Buffalo Officers JOHN DOES, CRISIS SERVICES, ALICIA FLOOD, and**

**SHALONNA WATTS**

82.        Plaintiff repeats and realleges each and every allegation contained in the preceding

paragraphs of this Complaint as if fully set forth herein.

83.        42 U.S.C. § 1985(3) provides a remedy where two or more persons conspire to deprive

another of equal protection of the laws or equal privileges and immunities under the law,

particularly when the conspiracy is motivated by discriminatory animus and effectuated through

overt acts that result in injury or deprivation of federally protected rights. See *Griffin v.*

*Breckenridge*, **403 U.S. 88, 102–03 (1971).**

84.         To establish a claim under § 1985(3), a plaintiff must prove: (1) a conspiracy; (2) for

the purpose of depriving, either directly or indirectly, any person or class of persons of the equal

protection of the laws, or of equal privileges and immunities under the laws; (3) an act in

furtherance of the conspiracy; and (4) injury to person or property, or a deprivation of any right

or privilege of a citizen of the United States. See *Mian v. Donaldson, Lufkin & Jenrette Sec.*

*Corp.*, **7 F.3d 1085, 1087 (2d Cir. 1993).**

85.         Defendants JOHN DOE Officers, CRISIS SERVICES, ALICIA FLOOD, and

SHALONNA WATTS knowingly entered into a coordinated agreement, whether implicit or

explicit to unlawfully deprive Plaintiff of her liberty, bodily integrity, and equal protection rights by orchestrating a pretextual psychiatric transport based on false claims, harassment, and fabricated medical conditions.

86.        This conspiracy was furthered by overt acts, including but not limited to:

- FLOOD and WATTS unlawfully obtaining Plaintiff's phone number and physical location,

- trespassing on Plaintiff's premises and provoking confrontation,

- supplying false and inflammatory statements to police while posing as concerned family members,

- CRISIS SERVICES relying entirely on hearsay and manufacturing fabricated medical documentation describing Plaintiff as delusional, bipolar, violent, and noncompliant with medication,

- JOHN DOE Officers effectuating an unlawful psychiatric seizure without a valid warrant, removal order, or mental health assessment, marking the fourth such encounter involving either the same officers or their counterparts from the Buffalo Police Department's E-District, each of whom had previously targeted, harassed, or violated Plaintiff's rights under similarly pretextual and unjustified circumstances within a 26 day

87.        As the Second Circuit has recognized, private actors may be liable under § 1985(3) when they engage in joint conduct with state actors to violate constitutional rights. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). Private parties need not themselves be state actors but may be held liable if they instigate, encourage, or conspire with public officials to deprive others of federally protected rights. *See also Burlington v. Josephson*, 153 F.2d 372, 376 (2d Cir. 1946).

88.      The retaliatory conduct described herein was driven by animus toward Plaintiff as a

whistleblower and vocal critic of government misconduct. Plaintiff's advocacy placed her within

a class of individuals protected under the "support or advocacy" clause of § 1985(3). Defendants'

joint efforts to target and silence her were rooted in viewpoint-based discrimination, an

unconstitutional motive violative of the Equal Protection Clause and the First Amendment. See

*Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Mian v. Donaldson, Lufkin & Jenrette Sec.*

*Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

89.      As part of this scheme, Defendants CRISIS SERVICES fabricated allegations that

Plaintiff was bipolar, delusional, violent, and noncompliant with medication. These false

statements made without any mental health assessment or verification were relied upon by JOHN

DOE officers to justify Plaintiff's unlawful psychiatric transport. Such actions were not taken in

good faith or pursuant to any lawful process, but as part of a coordinated campaign to discredit

Plaintiff and suppress her reporting activity. The Second Circuit has recognized that private

actors may be held liable under § 1985(3) when they engage in joint conduct with state actors or

conspire to instigate state action to deprive individuals of federally protected rights. See

*Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002); *Burlington v.*

*Josephson*, 153 F.2d 372, 376 (2d Cir. 1946).

90.      The nature of this misconduct aligns with the historically recognized practice of

punitive psychiatry; whereby mental health allegations are weaponized by state and non-state

actors to silence political dissidents and whistleblowers. Such misuse of psychiatric powers has

been deemed unconstitutional by both state and federal courts. See *Warney v. State*, 89 A.D.3d

1287, 1289 (3d Dep't 2011) (recognizing § 1983 claim for wrongful psychiatric commitment);

*Washington v. Harper*, 494 U.S. 210, 221–22 (1990) (recognizing liberty interest in avoiding

forced psychiatric treatment); *Youngberg v. Romeo*, **457 U.S. 307, 315 (1982).** In this case, Defendants' scheme resulted in Plaintiff's involuntary seizure, stigmatization, and the deprivation of fundamental liberty interests without due process of law.

91.       As a result, Plaintiff suffered physical and emotional trauma, reputational harm, deprivation of freedom, and incurred financial losses, including but not limited to lost wages, missed opportunities, and diminished quality of life.

92.       Accordingly, Plaintiff seeks compensatory damages, punitive damages, and all available relief under 42 U.S.C. § 1985(3), along with costs and attorney's fees pursuant to 42 U.S.C. § 1988.

**Third Cause of Action for violation of the Fourteenth Amendment as per 42 U.S.C. §1983 for the Denial of Plaintiff's Procedural and Substantive Due Process Plaintiff's Rights by Defendants City of Buffalo Police Officers JOHN DOES, CRISIS SERVICES, FLOOD, and WATTS.**

93.       Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

94.       The Fourteenth Amendment to the United States Constitution guarantees that no state shall deprive any person of life, liberty, or property without due process of law. Under 42 U.S.C. § 1983, individuals may bring a civil action against state actors, or private individuals acting in concert with state actors, who deprive them of these constitutional rights.

95.       Plaintiff had a constitutionally protected liberty interest in her bodily integrity, freedom of movement, and right to be free from arbitrary or unauthorized government

confinement. See *Washington v. Harper*, 494 U.S. 210, 221–22 (1990); *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982).

96.     On August 29, 2022, Plaintiff was subjected to an involuntary psychiatric transport initiated by Defendants CRISIS SERVICES, FLOOD, and WATTS, and carried out by JOHN DOE Officers, without prior notice, an opportunity to be heard, explicit consent, or any form of neutral medical evaluation.

97.     None of the Defendants possessed lawful authority under New York Mental Hygiene Law § 9.45 to order Plaintiff's removal. Defendants failed to conduct an independent mental health assessment, produce a removal order, or satisfy any statutory requirement necessary to justify Plaintiff's deprivation of liberty.

98.     Instead, the unlawful seizure was based on unverified hearsay and intentionally falsified information, namely, that Plaintiff was violent, delusional, bipolar, and a threat to others. These claims were fabricated by an fictitious entity "Kiesha" and repeated without investigation or verification by CRISIS SERVICES and JOHN DOE Officers.

99.     Defendants CRISIS SERVICES and JOHN DOE Officers further failed to inform Plaintiff of the reason for her detainment, failed to identify themselves upon seizure, and provided no documentation or recourse to challenge her involuntary confinement. Such conduct deprived Plaintiff of both procedural due process (notice and opportunity to be heard) and substantive due process (freedom from arbitrary government action).

100.     The coordinated effort to seize and confine Plaintiff without lawful process was not merely negligent, it was intentional, targeted, and retaliatory, arising from Plaintiff's exercise of

her First Amendment rights and her refusal to submit to harassment by private individuals and adversaries masquerading as family.

101.    As the Supreme Court held in *Zinermon v. Burch*, **494 U.S. 113, 126 (1990)**, a state actor's failure to provide constitutionally mandated procedures prior to involuntary commitment constitutes a deprivation of liberty without due process of law.

102.    Defendants' conduct also violated clearly established standards under *Vitek v. Jones*, **445 U.S. 480, 491–92 (1980)**, which held that involuntary commitment implicates serious liberty interests requiring advance procedural safeguards, including the right to be heard and evaluated by a neutral professional.

103.    Moreover, as Plaintiff has alleged, the conduct here represents not an isolated lapse but a continuation of a broader pattern of retaliatory abuse orchestrated by various actors and agencies after Plaintiff threatened litigation and reported misconduct, amounting to viewpoint-based punishment and punitive psychiatry practices prohibited by constitutional law.

104.    As a direct and proximate result of these due process violations, Plaintiff was unlawfully seized, confined, stigmatized, and psychologically and emotionally harmed, and incurred reputational and financial damages.

105.    Accordingly, Plaintiff seeks compensatory damages, punitive damages, declaratory relief, and all other available relief under 42 U.S.C. §§ 1983 and 1988.

**Fourth cause of action for violation of the Plaintiff's Fourth Amendment Rights to be
protected against illegal searches and seizures of her person as per 42 U.S.C. §1983 per
Monell v. Department of Social Services, 436 U.S 658 (1978) against Defendants CRISIS
SERVICES**

106.     Plaintiff repeats and realleges each and every allegation contained in the preceding

paragraphs as if fully set forth herein.

107.     Defendant CRISIS SERVICES is a publicly funded mental health intervention agency

that operates under the supervision of, and pursuant to regulations promulgated by, the New York

State Office of Mental Health (OMH). It is vested with authority to respond to alleged

psychiatric crises within Erie County and regularly coordinates with local law enforcement,

including the Buffalo Police Department, in effectuating mental health interventions.

108.     A municipality or private entity acting under color of state law may be held liable

under 42 U.S.C. § 1983 when a plaintiff establishes: (1) the existence of a municipal policy or

custom; (2) that such policy or custom caused a constitutional deprivation; and (3) that the policy

or custom was the moving force behind the plaintiff's injury. See *Monell v. Dep't of Soc. Servs.*,

**436 U.S. 658, 694 (1978);** *Torraco v. Port Auth. of N.Y. & N.J.*, **615 F.3d 129, 140 (2d Cir.**

**2010);** *Wray v. City of New York*, **490 F.3d 189, 195 (2d Cir. 2007).**

109.     Such a policy or custom may arise from (a) formal written regulations, (b) informal

practices so widespread and longstanding that they constitute de facto policy, (c) decisions of

final policymakers, or (d) a failure to supervise, screen, train, or discipline employees that

reflects deliberate indifference to the constitutional rights of citizens. See *Carter v. Inc. Vill. of*

*Ocean Beach*, **759 F.3d 159, 164 (2d Cir. 2014);** *Iacovangelo v. Corr. Med. Care, Inc.*, **624 F.**

**App'x 10, 13–14 (2d Cir. 2015).**

110.     At all relevant times, CRISIS SERVICES acted pursuant to institutional customs,

practices, and/or policies that permitted or encouraged the seizure and psychiatric detention of

individuals without objective medical evaluation, judicial authorization, or lawful predicate.

These practices included reliance on third-party hearsay, refusal to verify mental health status

through clinical observation, and coordinated use of law enforcement to suppress protected

speech and criticism through psychiatric confinement.

111.     Plaintiff was targeted by CRISIS SERVICES based on false, unverified allegations

supplied by a fictitious entity "Kiesha", alongside defendants FLOOD and WATTS who were not

family members, guardians, or treating professionals. Despite this, CRISIS SERVICES relied

entirely on these third-party accounts, without corroboration, interview, or assessment to

generate fabricated mental health documentation that characterized Plaintiff as delusional,

violent, noncompliant with medication, and in need of immediate hospitalization.

112.     These actions were undertaken in concert with the Buffalo Police Department and

JOHN DOE E-District officers, forming part of a coordinated pattern of extrajudicial retaliation

against Plaintiff in response to her whistleblower activities and protected complaints concerning

housing conditions, public health, and systemic misconduct. The purpose and effect of this

collaboration was to discredit Plaintiff, undermine her credibility, retaliate against her for

constitutionally protected expression, and cause reputational and professional harm, including

obstructing justice, chilling her advocacy, and removing her from her authorized premises under

false psychiatric pretenses.

113.     CRISIS SERVICES has a known history of such abuses. In *Jones v. Crisis

Services*, Index No. 805468/2021 (Erie Cty. Sup. Ct.), the plaintiff alleged similarly unlawful

psychiatric intervention initiated without proper legal or clinical basis. Moreover, hundreds of

publicly posted Google and Yelp reviews describe identical misconduct, including:

- Fabricated mental health reports;

- Unlawful collaboration with police to initiate forced transports;

- Ignoring requests for anonymity;

- Retaliatory detention of whistleblowers or complainants;

- And denial of due process protections.

114.     A representative sample of complaints includes allegations that CRISIS SERVICES

"caused more harm than needed," "set off panic attacks," "sent police to homes without

consent," and falsely claimed individuals were suicidal or mentally ill to justify emergency

holds. Several users report that CRISIS SERVICES operates as a "trap" or a "scam" that

collaborates with ECMCC to warehouse dissenters, strip individuals of their possessions, and

fabricate documentation for profit or administrative convenience.

115.     These reviews and prior litigation placed CRISIS SERVICES on notice of

longstanding unconstitutional practices. Nevertheless, CRISIS SERVICES failed to modify its

procedures, retrain staff, or adopt safeguards to ensure adherence to Fourth and Fourteenth

Amendment standards. Such deliberate indifference enabled Plaintiff's unlawful seizure and

confinement without judicial process or medical necessity.

116.     Academic literature has documented these patterns. As discussed in *The Disordered
and Discredited Plaintiff: Psychiatric Evidence in Civil Rights Litigation* (**University of Maine
School of Law**), there exists a systemic pattern whereby psychiatric labels are used to silence

dissent, shift judicial focus away from state misconduct, and undermine plaintiffs' credibility. CRISIS SERVICES' role in manufacturing psychiatric documentation without basis directly reflects these concerns.

117.    Upon information and belief, CRISIS SERVICES has developed a tacit partnership with local law enforcement to target vulnerable individuals, including whistleblowers, under the guise of mental health intervention. This policy is effectuated without adequate oversight, verification, or objective review and is therefore unconstitutional as applied.

118.    As a direct and proximate result of CRISIS SERVICES' unconstitutional policies, customs, and failures to supervise or discipline, Plaintiff suffered unlawful detention, deprivation of liberty without due process, reputational harm, financial losses, and emotional and psychological injury.

119.    Accordingly, Plaintiff seeks compensatory damages, punitive damages, and all other available relief under 42 U.S.C. § 1983 and § 1988.

### Fifth Cause of Action for violation of the Plaintiff's Fourth Amendment Rights to be protected against illegal searches and seizures of her person as per 42 U.S.C. §1983 per Monell v. Department of Social Services, 436 U.S 658 (1978) against Defendants CITY OF BUFFALO

120.    Plaintiff repeats and realleges each and every foregoing allegation of this Amended Complaint with the same force and effect as if fully set forth herein.

121.    Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be held liable under 42 U.S.C. § 1983 when the execution of its official policies, customs, or practices results in the deprivation of a constitutional right. To establish municipal liability, a plaintiff must show: (1) the existence of a municipal policy or custom; (2) that such policy or custom caused a constitutional violation; and (3) that the policy or custom was the moving force

behind the plaintiff's injury. See *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010); *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).

122.    Such a policy or custom may be evidenced by: (a) a formal regulation or ordinance; (b) decisions or actions by officials with final policymaking authority; (c) a persistent and widespread practice so entrenched as to constitute constructive knowledge of policymakers; or (d) a failure to train or supervise municipal employees that amounts to deliberate indifference. See *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13–14 (2d Cir. 2015); *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

123.    Defendant CITY OF BUFFALO, through its police department, including E-District officers has maintained an unconstitutional practice of unlawfully seizing civilians under the guise of mental health crises without warrants, probable cause, or lawful procedures. Plaintiff was subjected to four separate, unlawful encounters by these officers within a 26-day period in the month of August 2022, reflecting a persistent and targeted pattern of unconstitutional conduct.

124.    These encounters included repeated, warrantless intrusions, unlawful searches of Plaintiff's person and belongings, and an eventual forced psychiatric transport lacking any statutorily required documentation, physician certification, or exigency. Officers operated under color of law in each instance and acted with retaliatory motive, targeting Plaintiff due to her whistleblower status and prior complaints against police and affiliated private actors.

125.    Despite Plaintiff having made multiple prior complaints to the City and police department detailing serious federal and state crimes, and alleging the suspects, no action was

taken to investigate or protect her. Instead, CITY OF BUFFALO defendant officers, notably E-District escalated their targeting, culminating in unconstitutional seizures, including the one at issue herein.

126.       This conduct is not isolated. In *Rupp v. City of Buffalo*, No. 23-cv-00498 (W.D.N.Y. 2024), the plaintiff alleged unconstitutional conduct involving a warrantless, mental health-related home intrusion and unlawful seizure by Buffalo Police, raising substantially similar claims of Fourth Amendment violations. Likewise, in *Black Love Resists in the Rust v. City of Buffalo*, No. 20-cv-06528 (W.D.N.Y.), a class of plaintiffs challenged the City's pattern of racially biased policing, unconstitutional searches, and targeted retaliation, demonstrating that the Buffalo Police Department has a longstanding pattern of civil rights violations.

127.       These cases illustrate that the misconduct Plaintiff suffered—including warrantless searches and seizures, malicious prosecution stemming from a fabricated DWI arrest, forced psychiatric transport without legal authority, and retaliatory targeting—was not only foreseeable but part of an entrenched custom and practice among municipal actors. The DWI charge initiated against Plaintiff was ultimately dismissed, further demonstrating that she was subjected to criminal proceedings without probable cause as a means of harassment and discrediting. The E-District's repeated, coordinated targeting of Plaintiff within a concentrated 26-day period further reinforces the inference that such actions were not aberrational but reflective of the City's deliberate indifference and de facto policy of unconstitutional enforcement.

128.       A municipality may be held liable under § 1983 where its failure to train employees reflects a deliberate indifference to the constitutional rights of citizens. ***City of Canton v. Harris*, 489 U.S. 378, 388 (1989).** The City of Buffalo failed to adequately train or supervise its officers

and CIT personnel regarding the constitutional and statutory limits of mental health seizures and search authority. This failure constituted a moving force behind Plaintiff's harm.

129.    Public complaints, news coverage, and litigation reflect a pattern of unlawful seizures and retaliatory targeting by Buffalo City Police under mental health pretenses. Circumstantial evidence is sufficient to impute knowledge to policymakers where the practice is so widespread as to imply approval or ratification. ***Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012); *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993).**

130.    As a direct and proximate result of Defendant CITY OF BUFFALO's policies, practices, customs, and failures, Plaintiff suffered unlawful search and seizure of her person, trauma, reputational injury, and deprivation of her liberty in violation of the Fourth Amendment.

131.    Accordingly, Plaintiff seeks judgment against Defendant CITY OF BUFFALO for compensatory and punitive damages, attorneys' fees, costs, and all other relief available under 42 U.S.C. §§ 1983 and 1988.

## FACTUAL ALLEGATIONS OF CLAIM TWO

132.    Upon the plaintiff's arrival at ECMCC on August 29, 2022, she was unlawfully detained in the CPEP triage area for an excessive period of two hours before being subjected to a standard intake evaluation.

133.    The defendant's JANE DOE's who conducted the interview identified themselves as a Social Worker and a Crisis Service representative of ECMCC hospital.

134.    Upon information and belief, the intake evaluation was conducted based on the false allegations that were disclosed by defendants CRISIS SERVICES and purported fictitious entity,

"Kiesha" under the guise that the plaintiff arrived on legal status of § 9.45 papers under the provisions of the New York State Mental Hygiene Law (MHL) in accordance with the established reports.

135.    The plaintiff unequivocally asserts she never underwent a § 9.45 evaluation and the intake evaluators lacked objective evidence of one taking place. JANE DOE'S failed to provide her with adequate notice or explanation regarding the legal basis for her detention or custody during the relevant period.

136.    Following the standard intake evaluation, Plaintiff remained detained under the custody of ECMCC, not free to leave, and was subsequently subjected to evaluations under New York State Mental Hygiene Law § 9.27 by non-party Mark Sutton and defendant LAURA HANRAHAN on August 30, 2022, which was prematurely initiated prior to expiration of the 72-hour emergency observation period required under New York Mental Hygiene Law § 9.39.

137.    These evaluations occurred without Plaintiff's informed consent, without clear and convincing evidence to justify a finding of serious mental illness, and in the absence of any lawful basis for conversion from emergency status to long-term involuntary commitment.

138.    In accordance with established reports, the evaluations were based on false allegations and unverified hearsay attributed to defendants CRISIS SERVICES and the created fictitious entity, notably "Kiesha." Furthermore, it is alleged that defendant HANRAHAN fraudulently invoked a 9.45 legal status and utilized the fictitious entity, "Kiesha" as the collateral source to justify the plaintiff's initial confinement and subsequent evaluations.

139.    Despite Plaintiff's consistent denial of suicidal ideation, homicidal ideations, and unprovoked violent behavior, and the absence of a lawful § 9.45 status or qualifying emergency

determination, she was manufactured with a severe mental illness on August 30, 2022, without any clinical justification or objective evidence. This diagnosis was rendered without reference to the statutory definitions of "mental illness" under New York Mental Hygiene Law § 1.03(20), which require that any qualifying condition be demonstrably severe and include diagnoses such as schizophrenia, bipolar disorder, or major depressive disorder, *inter alia.*

140.    Plaintiff's documented medical history contained no diagnosis of a serious mental illness as defined under Mental Hygiene Law § 1.03(20), nor did ECMCC generate any contemporaneous clinical documentation that could substantiate such a finding. At no point was Plaintiff advised of the legal grounds for her continued detention or provided any explanation regarding the change in her status. Nonetheless, this unfounded diagnosis, predicated on hearsay, fabricated collateral sources, and mischaracterizations was improperly relied upon to effectuate her involuntary admission under MHL § 9.27 on August 30, 2022. The admission was executed pursuant to two separate but coordinated evaluations authored by Defendant HANRAHAN and non-party Mark Sutton. Additionally, Plaintiff was never personally assessed by the attending physician of record, Dr. Vinayak Gokhale, at any time relevant to her admission. **SEE EXHIBIT A.**

141.    Throughout her detention, Plaintiff's fundamental rights to informed consent and procedural justice were continuously violated, as established by ***Schloendorff v. Society of New York Hospital*** and pertinent New York laws. Due to being denied proper notice of her rights or informed consent, she was effectively prevented from challenging her detention or receiving competent legal representation, clearly violating her substantive due process rights and due process rights in general.

142.    The plaintiff repeats and reiterates, the involuntarily admission was conducted without providing Written Notice of the plaintiff's status directly to her in accordance with § 9.07, nor was there a Notification of Admission provided as stipulated by § 9.29 of the New York State Mental Hygiene Law (MHL) by the director in order for plaintiff to be informed or her rights, forfeiting her opportunity to challenge her involuntary commitment in accordance with a Writ of Habeas.

143.    Plaintiff who remained in ECMCC until her discharge on September 9, 2022, faced numerous wrongful and suspicious actions, including being denied prescribed medication for a mold exposure and hypokalemia diagnosis. It is important to note, this diagnosis was directly tied to evidence she intended to use in her legal case, as referenced in plaintiff's **BACKGROUND CONTEXT** paragraphs #32 and #33 set forth herein. In addition, defendant HANRAHAN, in accordance with her account pursuant to plaintiff's medical records, further undermined the plaintiff's claims by suggesting that the mold exposure diagnosis she disclosed could be based on delusions, despite medical records confirming its validity.

144.    During the same period, the plaintiff became aware of a devious scheme orchestrated by unknown parties who incessantly contacted the hospital staff under false pretenses. These individuals impersonated her son's father and alleged he was also a former fiancé, in an effort to influence her medical care and unlawfully advocate for her continued confinement.

145.    However, this deception was ultimately exposed when the actual father of Plaintiff's child directly contradicted these claims before ECMCC personnel. Despite this revelation, Defendants HANRAHAN, RINGLE, and/or ECMCC failed to reassess Plaintiff's confinement or investigate the improper communications.

146.     Amidst this unlawful detention, Plaintiff was subjected to an unauthorized evaluation conducted by Defendant NICOLE ABRUZZINO. Plaintiff was coerced into submitting to this assessment under the express threat that refusal would hinder or delay her release from ECMCC.

147.     During the plaintiff's interview with defendant ABRUZZINO, the plaintiff recounted the same events and provided her with a list of individuals whom she explicitly instructed not to communicate with on her behalf upon the conclusion of their interview. This list notably included the defendants ALICIA FLOOD and SHALONNA WATTS.

148.     The coercive nature of the evaluation led to further harm when Defendant ABRUZZINO's report was used to negatively influence a concurrent Family Court proceeding, as referenced hereinafter.

149.     On or about September 01, 2022, without lawful justification or reasonable cause, the plaintiff was taken into custody leading to her ongoing kidnapping and relocated to FiveZoneFour unit at ECMCC. On September 2, 2022, plaintiff became under the coercive care of defendant JULIA RINGLE as her initial interaction. This action occurred despite the absence of informed consent, lawful procedural and admissions under the New York State Mental Hygiene Law, objective evidence and the fictitious entity being utilized as the collateral source.

150.     Plaintiff was unaware of her right to a discharge hearing until she was informed by another patient. Acting promptly, she submitted a formal request for a hearing on September 2, 2022. This request triggered the first notice to the Mental Hygiene Legal Service (MHLS) regarding Plaintiff's unlawful admission. New York law mandates that such notification and procedural initiation occur immediately upon admission under authority of the Director of Community Services. **PLEASE REFER BACK TO EXHIBIT A.**

151.    During the period preceding the Mental Health court discharge hearing on September 07, 2022, the plaintiff encountered an issue regarding the whereabouts of her iPhone 12 device. This predicament arose when she required access to her phone for the second time to retrieve essential contact information.

152.    Defendant MARKEITH PRIDGEON, who had been summoned by the plaintiff via a Jane Doe medical personnel, due to his role in managing patients' belongings, reportedly informed the plaintiff that he was experiencing difficulties in locating her phone and was actively engaged in its search.

153.    The plaintiff expresses bewilderment regarding the disappearance and untrace ability of her phone over an extended period. The plaintiff's confusion stems from the fact that the phone was securely placed inside her compact purse, which was the sole property she had on her person before being unlawfully restrained and moved to the hospital against her will, as corroborated by Body Worn Camera footage. **SEE EXHIBIT B (photo of plaintiff's compact purse)**

154.    Days later, defendant PRIDGEON suddenly was able to locate the plaintiff's iPhone 12 and brought it up to the unit where she was located.

155.    It was later revealed upon a thorough investigation, the plaintiff's iPhone 12 device had been unlawfully tampered with and replaced. Following the plaintiff's discharge from ECMCC and upon further examination, she was given a blue iPhone 12 back oppose to her black iPhone 12 she had brought into the hospital with her.

156.    The plaintiff's inability to immediately notice the replacement of her phone right away, was attributed to her phone case bearing a striking resemblance. Furthermore, the plaintiff

was impeded from accessing her phone fully as a result of the hospital's stringent policy restrictions.

157.    Unknown suspects illicitly accessed and assumed complete control over all functionalities of this phone for a duration of nearly two weeks before it was disposed of. This breach resulted in the destruction of crucial evidence intended for utilization in a civil action pertaining to the aforementioned legal dispute that arose on or around July 20, 2022, as referenced in plaintiff's BACKGROUND CONTEXT paragraphs #32 and #33 set forth herein.

158.    This breach also compromised her Gmail account, social media profiles, banking applications, location data, as well as the personal identification numbers (PINs) linked to her debit cards and phone, leaving the plaintiff vulnerable to intense stalking, harassment, and elevated fear for her safety.

159.    The inaction of defendant PRIDGEON and ECMCC, who failed to protect and guard the plaintiff's belongings and/or his direct participation in the wrongful act led to unforeseen harm, making him implicated in the conspiracy to obstruct the plaintiff's privacy and subject to her unlawful surveillance and fear for her concern and safety. This conduct in handling Plaintiff's personal property, particularly the disappearance and substitution of her iPhone and loss of legal documentation, directly violated 14 NYCRR § 27.9, which mandates that all personal belongings retained by a facility for a patient "shall be properly identified, inventoried, and safeguarded." The regulation further requires the facility to "take all reasonable steps to assure that such property is protected from loss, theft, or damage." ECMCC and PRIDGEON failed to follow this procedure, either by negligently storing Plaintiff's items or allowing unauthorized access to her personal effects while she remained under their exclusive custodial control.

160.    Prior to plaintiff's discharge hearing on September 7, 2022, Plaintiff's assigned

MHLS counsel, Defendant SAMANTHA VENTURA, rendered ineffective assistance.

VENTURA failed to inform Plaintiff of her procedural rights, failed to investigate the lawfulness

of her detention, and neglected to challenge the absence of any verified removal order, warrant,

or lawful collateral source, notably "Kiesha". VENTURA's representation was constitutionally

deficient and undermined Plaintiff's ability to meaningfully defend herself.

161.    VENTURA further disregarded to scrutinize the identities and credibility of the

parties used to justify her confinement, specifically "Kiesha" the fictitious entity never verified

as Plaintiff's relative or lawful requesting party. VENTURA similarly failed to examine the

improper use of DWI allegations by non-medical staff, as well as the hospital's denial of

prescribed medication and procedural noncompliance with MHL § 9.27.

162.    VENTURA's conduct reflects not only a pattern of negligent representation but

deliberate indifference to Plaintiff's constitutional and statutory rights. By failing to challenge

the legality of Plaintiff's admission and to introduce exculpatory evidence or testimony from

credible witnesses, VENTURA conspired with ECMCC staff to maintain Plaintiff's unlawful

confinement.

163.    On September 07, 2022, around the 9:00AM hour, while in anticipation of the

plaintiff's Mental Health discharge hearing, the hospital custodians finally addressed the

cleanliness of her room and the unit. This action was "alleged" to be in direct response to the

plaintiff's numerous complaints regarding the unsanitary conditions that had persisted since their

transfer to the unit, citing the absence of sanitizing and daily cleaning in the bedrooms and living

area as needed.

164.     Shortly thereafter, the plaintiff was then escorted by hospital staff to the location of the court proceedings, adjacent to the FiveZoneFour unit.

165.     Prior to entering the proceedings area, Jane Doe misinformed the plaintiff that Judge Hon. Wojtaszek was assigned to preside over the case. The plaintiff, represented by her assigned counsel, was accompanied by her attorney and her son's father, who further advocated in support of the plaintiff's release.

166.     During a portion of the proceedings, the plaintiff's attorney cross-examined defendant JULIA RINGLE and challenged her justifications for keeping the plaintiff confined. One of the significant arguments raised by defendant RINGLE was the plaintiff's continued denial of having any connections with the entity named "Kiesha" who was listed as the cousin and Collateral Source for the plaintiff during her transport and hospitalization, and the information disclosed from JOHN DOE'S officer's regarding a DWI arrest upon plaintiff's transport to the hospital. **REFER TO EXHIBIT C FOR THE UNREDACTED ADMISSION OF JOHN DOE'S DISSEMINATION OF THE PURPORTED DWI DISCLOSURE.**

167.     However, the plaintiff's assigned counsel clarified that the sole connection the plaintiff had with a relative named "Kiesha" was one who had passed away almost ten years prior and addressed the DWI accusations and denial of medications on a legal basis.

168.     Additionally, the plaintiff's son's father, Mr. Jefferson, provided testimony in support of the plaintiff. He confirmed and alluded to the facts that the plaintiff did not pose an imminent threat to his safety during the date of incident and that the plaintiff did not make any threats prior to him being summoned third party by defendant FLOOD on the date of incident.

169.     Plaintiff's son's father, Mr. Jefferson, further confirmed he felt there was no reason that the plaintiff should be subjected to any further confinement.

170.     After the witness's testimony, all involved parties in the case actively engaged in the legal proceedings and provided their arguments regarding the matter. Subsequent to no further verbal arguments being presented before the plaintiff, the presiding judge rendered her decision.

171.     In this juncture, the plaintiff harbored a strong belief that she heard the judge issue an order for her release, resulting in the plaintiff being escorted back to the unit where she commenced packing her belongings.

172.     Shortly thereafter, Joe, a medical professional entrusted with the responsibility of monitoring the unit, approached the plaintiff's room. He informed her that a decision had not yet been reached and that the court was currently in recess.

173.     Subsequently, he revisited her room approximately five (5) minutes later and conveyed the unfortunate news that the judge had denied the plaintiff's discharge in her absence.

174.     During this particular moment, the plaintiff inquired to Joe about any insights regarding the reason for her denied release. Joe's response indicated his lack of involvement or presence during the legal proceedings, as the information was conveyed by an unidentified staff member at the hospital.

175.     Subsequently, the plaintiff realized that her personal belongings had gone missing while she was at court, this included her paper trail that she intended to use as evidence that was in the form of a diary. Upon discovering this, she promptly brought it to Joe's attention.

176.     A comprehensive search was conducted throughout the unit, including all patient rooms; however, no trace of the missing items was located. Approximately one hour later, it was reported that hospital custodial staff re-entered the plaintiff's room during her absence for a court appearance and, within a span of about 20 minutes, conducted a second cleaning, allegedly under the mistaken belief that the plaintiff's belongings were disposable.

177.    Subsequent to this matter, her belongings were eventually returned to her possession. However, upon inspection, it was revealed that crucial documentation essential for her records and potential legal proceedings had inexplicably vanished that was intended for use as evidence.

178.    A nearby longstanding employee of the hospital, who had firsthand knowledge of the incident in question and other events related to the plaintiff, such as the disappearance of her phone for an extended period and her observable normal behavior when not under the influence of medication to wit, but not limited to, casually remarked aloud, "somebody's targeting that girl."

179.    On September 08, 2022, the defendant JULIA RINGLE conducted another evaluation on the plaintiff, still utilizing the created fictitious entity "Kiesha" as her collateral source to justify the continued confinement.

180.    Despite plaintiff being denied her prescribed medication her whole hospitalization due to her diagnosis of mold exposure, she was coerced into taking psychiatric medication under duress by defendant JULIA RINGLE in exchange for an early release on the night of September 8, 2022, for the first time, without being adjudicated or clear and convincing evidence stabilization was warranted. See *Rivers v. Katz, 495 N.E.2d 337 (and Grassi v. Acrish).*

181.    This resulted in plaintiff's harmful side effects, where plaintiff suffered bodily injury akin to a heart attack, amongst other harmful unusual bodily sensations and prolonged treatment to documented diagnosis.

182.    The following morning, on September 09, 2022, the plaintiff reported sensations akin to a heart attack and described feeling unusual and discomforting bodily sensations upon waking up after the intake of Risperidone medication the previous night.

183.    The potential side effects and concerns regarding more grave reactions to this psych medication over a two-week period in order to be discharged were significant. As a result, the plaintiff felt compelled to reach out to her son's father, VENTURA, and the Supreme Court building to seek clarification on the final ruling of the court hearing, since the medical personnel were taking unusually long in providing the plaintiff with a copy of the court order as requested.

184.    In this instance, as opposed to the plaintiff being provided with the court order from the hearing, she was handed a copy of a filed petition, requesting Medicine Over Objection bearing a submission date of September 8, 2022.

185.    It was then uncovered that the defendant, PAULA FEROLETO, was the actual judge presiding over the case, opposed to Hon. Paul Wojtaszek. This information was provided by a chief clerk employee at the Erie County Supreme Court Building. Plaintiff, unbeknownst at this time, that the last name Wojtaszek belonged to a male justice, it was virtually impossible for plaintiff to confirm the gender.

186.    Moments later, a senior psychiatrist named Dori Marshall forced the plaintiff off the phone in order to conduct a second opinion, before the plaintiff could obtain any further information regarding the court order and grounds for the ruling through the Chief Clerks office.

187.    After the plaintiff and Ms. Marshall's interview was concluded, she was then set for release the same day in the late afternoon, September 09, 2022.

188.    Following her release from ECMCC on September 9, 2022, Plaintiff encountered a protracted and burdensome process of uncovering extensive procedural irregularities, omissions, fraud, and constitutional violations committed by defendants, ECMCC, HANARAN, RINGLE, FEROLETO, VENTURA, individually and/or collectively and additional defendants to this claim. The conduct at issue spans multiple years and reflects a systemic pattern of abuse,

disregard for due process, and deliberate indifference, all of which are detailed herein and form the basis of Plaintiff's claims under 42 U.S.C. § 1983.

189.      Plaintiff discovered that the required procedures outlined in the OMH 471A (Involuntary Admission on Medical Certification) application, as mandated by § 9.27 of the New York State Mental Hygiene Law, were not followed.

190.      In this instance, on August 27, 2024, Plaintiff discovered that Defendant UNIQUE JONES falsely submitted the admission application, asserting a nonexistent doctor-patient relationship with Plaintiff, despite never having evaluated or treated Plaintiff in history. Such conduct constitutes the falsification of medical records in violation of New York Penal Law § 175.30, which prohibits offering a false instrument for filing in the first degree, as well as a potential violation of New York Public Health Law § 18(2)(e) concerning the integrity and accuracy of patient medical records. Defendant Jones's actions were not only unethical but criminal in nature and materially contributed to Plaintiff's unlawful confinement. **SEE EXHIBIT D.**

191.      It was further discovered that Defendants HICKS and RINGLE executed medical certifications in support of the plaintiff's involuntary admission without performing the required independent and/or valid pre-admission evaluations, thereby rendering their certifications noncompliant with the statutory mandates of New York Mental Hygiene Law § 9.27. Specifically, Defendant HICKS failed to conduct any independent evaluation of the plaintiff at any point during the plaintiff's confinement, while Defendant RINGLE signed the medical certification without conducting a prior in-person examination or evaluation of the plaintiff before endorsing Defendant JONES' admission application. **PLEASE REFER BACK TO EXHIBIT D.**

192.     In or about mid-2024, after receiving information from outside sources and conducting her own independent legal research into the procedural requirements of MHL § 9.27, Plaintiff learned for the first time that ECMCC was required to maintain, and had failed to produce, critical admission documents, including but not limited to: (a) a verified application for admission submitted by a qualified applicant; (b) two OMH Form 471A medical certifications rendered after independent psychiatric evaluations; (c) written advisements of Plaintiff's rights; and (d) documentation of collateral sources. Upon realizing that these documents were entirely missing from all prior productions, Plaintiff concluded that these records were either being intentionally withheld or sequestered in a different administrative repository within ECMC's control.

193.     In the issue at hand, on or around July 2024, while Plaintiff had already commenced a pending civil proceeding seeking to seal her mental health records pursuant to the NYS MHL § 33.14, and while ECMC was in possession of those legal filings, Plaintiff submitted a Freedom of Information Law (FOIL) request under New York Public Officers Law Article 6 seeking production of the previously undisclosed admission records.

194.     ECMCC's legal department, including Attorney Alexandra Herr, acknowledged this FOIL request while fully aware of the pending litigation. On August 16, 2024, Attorney Herr responded by characterizing the disclosure as a mere "re-issuance" of previously released records, despite these critical documents never having been produced during Plaintiff's earlier record requests. **SEE EXHIBIT E.**

195.     Plaintiff contends that this strategic "re-issuance" language was designed to obscure ECMCC's prior concealment and mitigate institutional liability while under active litigation. On August 16, 2024, following receipt of Attorney Herr's email, Plaintiff submitted a written

rebuttal directly to ECMCC's legal counsel, advising that critical documents specifically, admission-related paperwork, medical certifications, collateral source information, and other essential documentation had never been produced in any of Plaintiff's prior medical record requests. Plaintiff further raised violations of HIPAA, including ECMCC's improper reliance on Plaintiff's outdated October 2023 authorization form in violation of 45 C.F.R. § 164.508(b)(2)(i), as well as violations of New York Public Health Law § 18. Despite Plaintiff's written objections and legal citations, Attorney Herr and ECMCC failed to respond or provide any explanation addressing these violations. **SEE EXHIBIT F.**

196.    Pursuant to Mental Hygiene Law § 33.16(c)(2), whenever a mental health provider refuses access to any portion of a patient's records, the provider must issue a written denial stating the reasons for such refusal and advising the patient of their statutory appeal rights. At no point did ECMCC issue any such written denial notices explaining or justifying its refusal to disclose these essential records. This failure to issue statutory written denials constitutes a violation of MHL § 33.16(c)(2) and independently establishes bad faith concealment.

197.    ECMCC ultimately released these previously concealed documents, that was received by plaintiff on August 27, 2024, utilizing Plaintiff's outdated October 2023 authorization form, in violation of HIPAA 45 C.F.R. § 164.508(b)(2)(i), New York Public Health Law § 18, and HIPAA 45 C.F.R. § 164.508(c)(2)(iii), which prohibits improper conditioning of authorizations for litigation defense purposes.

198.    Moreover, all documents contained within ECMCC's fourth records production released on August 27, 2024, following Plaintiff's FOIL request bore ECMCC's internal control barcode stamps, indicating that these documents were processed through ECMCC's internal medical records system. In contrast, none of the medical record documents previously produced

to Plaintiff after executing medical release forms in December 2022, August 2023, or October 2023 contained such barcoding. While portions of the August 2024 production contained certain duplicate records previously provided, critical admission documents including certifications, collateral source reports, and admission applications were produced for the first time. Plaintiff contends that the presence of these ECMCC barcodes on previously undisclosed records either demonstrates that ECMCC knowingly withheld these materials despite maintaining them internally, or that ECMCC manufactured certain records after-the-fact in an effort to legitimize its prior unlawful conduct. The significant discrepancies between the prior unstamped productions and the newly stamped documents further demonstrate the fraudulent concealment of records essential to Plaintiff's legal claims.

199.    Prior to this, in June 2024, the plaintiff obtained court records from the Erie County Clerk's Office pertaining to her Mental Hygiene Law (MHL) § 9.31 discharge hearing held on September 7, 2022. This discovery revealed critical procedural irregularities and further substantiated the plaintiff's longstanding concerns regarding the legitimacy of her involuntary admission at ECMCC. Retroactively, and in connection with the later discovery of manufactured and/or concealed medical records that were withheld until August 27, 2024, these documents exposed a coordinated scheme to deprive the plaintiff of her liberty without due process.

200.    The inconsistencies between the court filings, the timing of the hearing, and the absence of any supporting clinical or legal documentation raised serious constitutional concerns and pointed to a conspiracy against rights, in violation of 18 U.S.C. § 241. These irregularities form the foundation for the plaintiff's claims of judicial misconduct, systemic concealment, and intentional circumvention of her due process protections under the Fourteenth Amendment.

201.        The plaintiff contends that the September 7, 2022, discharge hearing was not merely procedurally flawed but orchestrated as part of a broader conspiracy to deprive her of her civil rights. The Request for Judicial Intervention (RJI), bearing an emergency designation under 22 NYCRR §§ 202.5(e) and/or 206.5(e), was electronically filed at 9:39 a.m. within minutes before and/or during court hearing, without any supporting documentation, affidavits, or clinical evidence justifying her continued confinement. **SEE EXHIBIT G**

202.        Despite this, the defendant FEROLETO proceeded with the hearing and rendered a decision adverse to the plaintiff in her absence, after she was removed from the court room under the false pretense of a recess. This suggests that defendants FEROLETO, ECMCC agents, RINGLE, VENTURA, and other legal actors conspired in advance to rubber-stamp a predetermined outcome, violating plaintiff's procedural and substantive due process rights under the Fourteenth Amendment. These acts constitute a conspiracy to deprive rights in violation of 18 U.S.C. § 241.

203.        Furthermore, the plaintiff observed that the Request for Judicial Intervention (RJI) filed that same morning at 9:39 a.m. erroneously listed her as the respondent, while the presiding judge's signed order listed her as the petitioner. This internal inconsistency in party designation is not a clerical triviality but reflects a breakdown in procedural integrity. The mislabeling, in conjunction with the filing's timing mere minutes before and/or during the hearing and the absence of any supporting documentation, affirmations, or affidavits, demonstrates that the proceeding lacked formal notice, evidentiary basis, and impartiality. These irregularities suggest that the hearing was prearranged in violation of state court procedure and federal due process, and support plaintiff's contention that the judicial actors and hospital staff were acting in concert to effectuate her unlawful confinement.

204.    This misconduct it further confirmed that the purported court recess was, in fact, a continuation of the proceedings conducted in Plaintiff's absence, thereby constituting improper *ex parte* communications and violating her right to be present and heard. Defendant FEROLETO is alleged to have relied upon unverified and false materials, without affording Plaintiff the opportunity to contest the evidence, present defenses, or object to procedural irregularities. This conduct violated Plaintiff's substantive and procedural due process rights under the Fourteenth Amendment to the U.S. Constitution, as well as judicial obligations to ensure fairness and impartiality under New York Code of Judicial Conduct § 100.3(B)(6) and CPLR § 4301, which guarantee a litigant's right to be heard in their own matter. SEE: ***Mathews v. Eldridge*, 424 U.S. 319 (1976), and *Goldberg v. Kelly*, 397 U.S. 254 (1970)** (both of which affirm that due process requires timely notice, the opportunity to be heard, and procedural safeguards before a deprivation of liberty may occur.)

205.    It's evident defendant FEROLETO appeared predisposed to deny relief, relying on unsupported allegations presented ex parte by Defendant RINGLE, who had met the plaintiff only twice for brief encounters and disregarding the absence of key witnesses like JONES and the fictitious collateral source "Kiesha." The transcript reveals that the ruling was issued without the plaintiff's presence, further confirming procedural misconduct and a possible conspiracy to maintain her unlawful confinement. **SEE EXHIBIT I**.

206.    In the event the defense asserts that a Mental Hygiene Law § 9.31 hearing concerns only the justification for continued hospitalization and not the legality of the initial commitment. However, where the plaintiff's confinement was premised on fraudulent, hearsay-based, or fictitious sources, the legitimacy of continued detention cannot be separated from its unlawful origin. To rely exclusively on Defendant RINGLE a psychiatrist who briefly interacted

with Plaintiff while excluding the parties responsible for the original admission and omitting

Plaintiff from a full hearing, violated both statutory due process and the Fourteenth Amendment.

The court's refusal to consider contrary evidence or afford Plaintiff a meaningful opportunity to

challenge the detention renders the proceeding constitutionally infirm.

207.    It is asserted that FEROLETO and VENTURA failed to uphold their sworn duty to the

law and Constitution by violating the plaintiff's substantive due process rights. The opposing

party, notably defendants RINGLE and ECMCC presented no evidence to establish subject

matter jurisdiction over the plaintiff, actions which directly contravened New York State Judicial

Conduct § 100.3 (B)(1) and § 100.3 (6), as well as VENTURA's obligations under the New York

State Rules of Professional Conduct.

208.    This failure infringed upon the plaintiff's Fourteenth Amendment due process

rights and protections under New York CPLR § 3103, depriving them of a fair opportunity to

assert defenses. Additionally, it is highly irregular, if contended, for a justice to issue a ruling

within minutes particularly when claiming "Recess" in the absence of the initiating party, notably

the plaintiff.

209.    The individual conduct of plaintiff's then assigned counsel, Defendant

VENTURA, as detailed in the preceding paragraphs, reflects a pattern of willful disregard for

Plaintiff's constitutional and statutory rights, amounting to a conspiracy to violate her civil

liberties in violation of 18 U.S.C. § 241. VENTURA's repeated failures ranging from her refusal

to investigate the legality of Plaintiff's confinement to her complicity in the presentation of

fabricated evidence, demonstrate not mere negligence, but a concerted and deliberate

indifference to the Plaintiff's due process rights. Taken together, these omissions and actions

support a broader narrative of collusion and misconduct that undermines the integrity of the legal

proceedings and raises serious questions regarding VENTURA's intent and adherence to professional and legal obligations.

210.      Plaintiff contends that the facts set forth throughout Claim Two of this complaint establish that Defendants acted jointly in a deliberate campaign to undermine her credibility and silence her through punitive psychiatry. Their actions reflect not mere negligence, but a coordinated effort to fabricate mental illness as a means of justifying unlawful confinement.

211.      It is implausible that a team of trained professionals, rather bound by oath to uphold the Constitution, could engage in such consistent misconduct without intent. The pattern of errors, misrepresentations, fraud, and concealments inflicted significant violations of Plaintiff's substantive and procedural due process rights under the Fourteenth Amendment, her Fourth Amendment protections against unlawful seizure, and her personal autonomy.

212.      Defendants' abuse of professional authority inflicted lasting harm and set a dangerous precedent within the mental health system, particularly for individuals who are unlawfully targeted and silenced for exercising their First Amendment rights. The conduct of Defendants HANRAHAN and RINGLE who distorted and manipulated Plaintiff's statements to support pretextual diagnoses, constitutes a knowing violation of Plaintiff's civil rights and is actionable under New York Penal Law § 20.00.

213.      Further review of Plaintiff's medical records reveals improper inclusion of statements made by unidentified defendant "JOHN DOE" officers, who claimed that Plaintiff had recently been arrested for DWI on August 27, 2022. While this arrest did occur, the charge was later dismissed in Plaintiff's favor due to lack of probable cause under *People v. Ingle* on December 17, 2024. Despite the lack of a conviction and without any formal diagnosis of a substance use disorder, these statements were used by Defendant RINGLE during the discharge

hearing to justify Plaintiff's continued confinement. RINGLE mischaracterized the arrest as evidence of a severe substance abuse disorder, further compounding the procedural violations and wrongful deprivation of Plaintiff's liberty.

214.    The record supports a pattern of coercion, psychiatric labeling, and medical bullying designed to discredit her dissent and suppress her legal advocacy. This conduct mirrors well-documented patterns of political psychiatry used to neutralize perceived threats to the state or institutions. See: Hogg Foundation for Mental Health and Wikipedia – Political Abuse of Psychiatry.

215.    These abusive practices are further illustrated by how civil defendants weaponize psychiatric histories to (1) suggest alternative causes for a plaintiff's injuries, (2) undermine credibility by questioning perception or recall, and (3) imply propensities that justify institutional response. All three tactics were employed against Plaintiff here.

216.     Plaintiff further asserts that correspondence from the Central Files Office at the New York State Office of Mental Health (OMH) confirms that no records exist documenting her receipt of services or legal detention under any statutory authority. This glaring absence of official records is particularly alarming given that psychiatric facilities such as ECMC are legally mandated to maintain and report detailed documentation of all involuntary admissions, including but not limited to certificates, admission applications, supporting affidavits, and authorization justifications. Pursuant to 14 NYCRR § 543.4 and Mental Hygiene Law Article 33, such records must be properly maintained and made available for oversight and legal compliance. The lack of any such documentation in Plaintiff's case underscores the fraudulent and arbitrary nature of her alleged confinement and strongly supports her claim that the hospitalization was executed in bad

faith and in violation of statutory protections. This concealment of legal and medical documentation further perpetuated a false and defamatory narrative that damaged Plaintiff's reputation and civil standing. **SEE EXHIBIT J.**

## First cause of action for violation of the Fourth Amendment as per 42 U.S.C. §1983 for the illegal seizure of Plaintiff person by Defendants ECMCC, JONES, HICKS, HANRAHAN, and RINGLE

217.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action for paragraphs #132-216.

218.    The Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits unreasonable searches and seizures. Under 42 U.S.C. § 1983, individuals may bring a civil action against any person acting under color of state law who deprives them of these constitutional rights.

219.    To state a claim for false arrest or unlawful seizure, Plaintiff must allege: (1) the Defendants intended to confine her; (2) she was conscious of the confinement; (3) she did not consent to the confinement; and (4) the confinement was not otherwise privileged. See *Singer v. Fulton County Sheriff*, **63 F.3d 110, 118 (2d Cir. 1995).**

220.    The Fourth Amendment of the United States Constitution protects the citizenry for unreasonable seizures. "[S]eizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." **Katz v United States, 389 US 347, 357 (1967).**

221.    In the case at bar, the defendants ECMCC, JONES, HICKS, HANRAHAN, and RINGLE intended to confine Plaintiff at ECMCC beginning August 30, 2022, by orchestrating her continued detention and involuntary commitment through falsified paperwork and fabricated evaluations; (2) Plaintiff was fully aware of her confinement, as she was physically restricted from leaving ECMCC and monitored by staff; (3) she did not consent to confinement, did not request treatment, and objected repeatedly to psychiatric care; and (4) the confinement was not legally justified, as the statutory requirements of MHL § 9.27 were not satisfied, rendering the confinement unauthorized and unlawful.

222.    Under MHL § 9.27, lawful involuntary admission requires: (a) an application by a qualified person listed in § 9.27(b); (b) two concurring certificates from physicians based on recent personal examination under § 9.27(a); (c) a determination that no less restrictive alternative is appropriate under § 9.27(d); (d) a third, independent staff physician certification upon admission under § 9.27(e); (e) immediate notification to the Mental Hygiene Legal Service under § 9.29(a); and (f) written notice to the patient's nearest relative or designated persons within five days of admission under § 9.29(b).

223.    Here, on August 27,2024 plaintiff discovered that Defendant JONES knowingly and deliberately fabricated false allegations to support and execute the plaintiff's admission process under § 9.27, acting with full awareness and intent to manipulate the process.

224.    According to § 9.27, an application for admission must be made by a "qualified psychiatrist" who is either supervising the treatment of or treating person for a mental illness in a facility licensed or operated by OMH. This statue mandates the qualified psychiatrist should have prior knowledge of the individual's mental health history and circumstances that justify their admission. *Id* § 9.27.

225.      Defendant JONES had no prior professional relationship with the Plaintiff related to psychiatric or substance abuse treatment that granted her jurisdiction to submit an application for the Plaintiff's admission. Furthermore, Defendant JONES lacked any prior knowledge of the Plaintiff's medical history or condition necessary to assess whether detention met established legal or medical criteria.

226.      The plaintiff further asserts that defendant JONES failed to conduct any evaluation of the plaintiff either prior to her application for admission or thereafter, thereby neglecting to raise any objective assessments.

227.       Defendant JONES's misconduct invalidated her application for admission, as her arbitrary actions violated both jurisdictional and subject matter requirements (substantive due process) under the New York State Mental Hygiene Law § 9.27, implicating defendants HICKS, HANRAHAN, and RINGLE in a coordinated conspiracy.

228.      The plaintiff further contends that the records revealed defendants HICKS and RINGLE deliberately signed off as the second and third accompanying physicians, alongside HANRAHAN to unlawfully validate defendant JONES' initial admission of the plaintiff under New York State Mental Hygiene Law § 9.27.

229.      This matter further contravened the mandated requirements and admissions process under the New York State Mental Hygiene Law § 9.27.

230.      Defendant HICKS failed to evaluate or independently examine the plaintiff prior to admission, or thereafter and lacked any objective evidence during the relevant period, including the absence of medical records necessary to verify whether JONES' actions and justifications had any legal basis.

231.     Defendant RINGLE, alongside HICKS and JONES, neglected to assess the plaintiff before the admission on August 30, 2022, to confirm if JONES actions and justification had any legal basis. The plaintiff's initial interaction with RINGLE occurred on September 2, 2022, during daylight hours, and her subsequent detention of the plaintiff lacked any legal justification, as RINGLE unlawfully relied on the fictitious entity, "Kiesha" as the collateral source in accordance with her account, as a basis to justify the continued confinement. RINGLE knowingly committed perjury by signing JONES' application on September 2, 2022, at 4:16 a.m., falsely certifying that she examined the plaintiff on September 1, 2022, or during the relevant time period. **PLEASE REFER BACK TO EXHIBIT D**.

232.     The plaintiff's 24-hour Patient Safety Check Report and firsthand knowledge confirm that the plaintiff was discharged from the CPEP area on September 1, 2022, at 17:09 pm, transferred to FiveZoneFour (RINGLE's designated area), and received no examination post-transfer, with none of the four sets of medical records from that day containing clinical notes to suggest otherwise. **SEE EXHIBIT K**.

233.     The defendants blatantly disregarded the mandated procedures under New York State Mental Hygiene Law § 9.27 by failing to evaluate or examine the plaintiff prior to admission on August 30, 2022, resulting in wrongful malicious acts related to her commitment. Furthermore, they lacked clear and convincing evidence necessary to justify detaining a non-dangerous individual against their will, as established in ***Demarco v. Sadiker, 897 F. Supp. 693 (E.D.N.Y 1995) and Addington v. Texas (425-428, 431).***

234.     The Supreme Court has established that individuals cannot be deprived of their liberty without sufficient justification. For instance, in ***Addington v. Texas*, 441 U.S. 418 (1979),** the Court held that civil commitment must be supported by clear and convincing evidence that the individual poses a danger to themselves or others, which the defendants lacked.

235.     Plaintiff's person should not have been seized pursuant to the New York State Mental Health Hygiene laws, as well as the Fourth Amendment of the U.S. Constitution.

236.     As a result, Plaintiff was subjected to unlawful restraint and confinement in violation of her Fourth Amendment rights, *inter alia*. The plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for these violations.

**Second Cause of Action for Violation of the Fourteenth Amendment as per 42 U.S.C. §1983 for the conspiracy and deprivation against rights of Plaintiff by Defendants JANE DOES, JONES, HICKS,  HANRAHAN, RINGLE, FEROLETO and VENTURA**

237.     Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action for paragraphs #132-216.

238.     To maintain a claim for conspiracy a plaintiff must establish: (1) an agreement between two or more persons; (2) intent to commit an unlawful act; (3) at least one overt act taken in furtherance of that agreement; and (4) knowledge and participation by each conspirator; See **Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).**

239.     Defendants JONES, HICKS, HANRAHAN, RINGLE, FEROLETO, VENTURA, and unidentified JANE DOES each participated in a coordinated plan to unlawfully restrain and

admit Plaintiff to ECMCC without judicial authorization, probable cause, or lawful adherence to the New York Mental Hygiene Law (MHL), including §§ 9.27 and 9.29.

240.     The objective of this concerted effort was to silence, discredit, and punish Plaintiff for exercising her First Amendment rights, including lodging complaints and exposing misconduct.

241.     In furtherance of this conspiracy, Plaintiff was involuntarily seized and detained for 11 days under § 9.27 MHL for a false behavioral health narrative, facilitated by fabricated documentation, fictitious collateral sources (i.e., "Kiesha"), and improper evaluations. Key actors, including HANRAHAN and RINGLE, willfully ignored Plaintiff's consistent denials of mental illness and lack of any qualifying psychiatric history.

242.     Plaintiff explicitly denied knowing "Kiesha" and repeatedly advised Defendants that the allegations prompting her commitment were false and unsupported, including to HANRAHAN, SUTTON, RINGLE, FEROLETO, and VENTURA. Despite this, the Defendants deliberately failed to verify facts, relying instead on misrepresentations and omitting material facts.

243.     Defendant FEROLETO, presiding over Plaintiff's September 7, 2022, discharge hearing, knowingly permitted ex parte arguments in Plaintiff's absence and ratified continued confinement despite a lack of testimony from the author of the § 9.27 application (JONES) or any expert with relevant knowledge of Plaintiff's mental health history.

244.     Defendant VENTURA, though appointed to represent Plaintiff, failed to advocate for Plaintiff's rights, investigate the facts, or object to violations of procedural and substantive due process. Her complicity in the events furthered the unconstitutional detention and supported the false narrative advanced by state actors.

245.        The conduct of these Defendants jointly and severally violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983.

246.        The plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for these violations.

**The Plaintiff asserts a third cause of action for violation of the Fourteenth Amendment under 42 U.S.C. §1983, for False Imprisonment as per violation of the Substantive Due Process Clause under the NYS Mental Hygiene Law § 9.27 against Defendants ECMCC, JONES, HICKS, HANRAHAN, RINGLE, FEROLETO and JANE DOE.**

247.        Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action for paragraphs #132-216.

248.        The Fourteenth Amendment protects individuals from deprivation of life, liberty, or property without due process of law. See Mathews v. Eldridge, 424 U.S. 319 (1976).

249.        The defendants did not provide the plaintiff with clear reasons for her involuntary commitment to the hospital, violating her right to due process as guaranteed by the Fourteenth Amendment.

250.        The Fourteenth Amendment prohibits the deprivation of liberty without due process of law. See *Mathews v. Eldridge*, 424 U.S. 319 (1976). Defendants failed to provide Plaintiff with clear reasons or lawful notice for her involuntary commitment to ECMCC, violating her substantive due process rights.

251.    Defendants further failed to provide the procedural safeguards mandated by the Constitution and Mental Hygiene Law prior to confining Plaintiff, including lack of timely court oversight, absence of informed consent, and failure to deliver written notice of rights. Under *Addington v. Texas*, 441 U.S. 418 (1979), substantive due process requires clear and convincing evidence of mental illness and dangerousness before a person can be involuntarily confined. Here, Plaintiff was denied this protection.

252.    Defendant JONES, claiming to be Plaintiff's psychiatric case manager, submitted the § 9.27 application without proper authority or lawful basis. Defendant HICKS falsely certified an independent psychiatric examination. Defendant HANRAHAN relied on fabricated statements, a fictitious "collateral source" named "Kiesha," and misrepresented Plaintiff's legal status under MHL § 9.45. Defendant RINGLE, who affirmed under penalty of perjury that she evaluated Plaintiff on September 1, 2022, did not meet Plaintiff until September 2 and also relied on fictitious hearsay.

253.    MHL § 9.27 requires strict adherence to a three-tier process: (1) an application by an authorized party; (2) two medical certificates following independent examinations; and (3) a third certification upon hospital admission. See ***Matter of Nancy H.*, 177 Misc. 2d 30, 31 (Sup. Ct. NY Cty. 1998).**

254.    Plaintiff was not informed of her rights, not granted a hearing prior to her admission, and no valid court order existed to justify her seizure and confinement. Defendants failed to provide proper written notices to Plaintiff and her designated contacts and failed to notify the Mental Hygiene Legal Service (MHLS), as required by MHL § 9.29.

255.    Defendants' actions resulted in Plaintiff's prolonged involuntary detention without legal justification, infringing her liberty and ability to contest her confinement.

256.    Plaintiff asserts that Defendant FEROLETO did not act in a judicial capacity but as a willful participant in an extra-judicial conspiracy to deprive her of liberty without due process. FEROLETO knowingly approved and ratified an unlawful psychiatric detention based on fabricated records, misrepresentations, and a fictitious collateral source, without any sworn affidavit, legal affirmation, or evidentiary foundation to justify Plaintiff's continued confinement.

257.    Court documents were filed mere minutes before the scheduled hearing and never properly served, preventing Plaintiff from responding or appearing meaningfully. Despite these procedural failures and the absence of valid medical certifications or an authorized § 9.27 application, FEROLETO permitted ex parte communications, disregarded controlling statutory mandates, and issued a ruling that lacked both jurisdictional integrity and legal justification. These actions were not judicial in nature but part of a coordinated scheme to silence and punish Plaintiff for exercising her First Amendment rights

258.    Plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for these violations.


**The Plaintiff asserts a fourth cause of action for violation of the Fourth Amendment under 42 U.S.C. §1983, citing unreasonable searches and siezures against Defendant MARKEITH PRIDGEON**

259.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action for paragraphs #132-216.

260.     At all relevant times, Defendant MARKEITH PRIDGEON was employed by Erie County Medical Center Corporation (ECMCC) in a capacity that involved managing and safeguarding the personal property of patients in custody and care.

261.     Plaintiff alleges that Defendant PRIDGEON knowingly violated her Fourth Amendment right to be free from unreasonable searches and seizures when he permitted unauthorized access to her personal property, specifically her mobile phone without her consent, legal process, or justification.

262.     Upon information and belief, Defendant PRIDGEON either personally facilitated or negligently failed to prevent third parties from tampering with Plaintiff's phone while it was in ECMCC's custody, resulting in the unlawful removal and/or swapping of her original device with a compromised replacement.

263.     This tampering deprived Plaintiff of valuable evidence stored on her original device, including records essential to her legal defense and documentation of prior constitutional violations. Additionally, the substituted phone was compromised with unauthorized tracking software or malware, placing Plaintiff's personal safety and privacy at serious risk.

264.     Defendant's actions were neither authorized by law nor executed pursuant to any institutional policy permitting search or seizure of private devices without consent. No warrant, probable cause, or exigent circumstance justified the intrusion, making the seizure per se unreasonable under the Fourth Amendment.

265.     As a direct and proximate result of Defendant PRIDGEON's misconduct, Plaintiff suffered significant harm, including the loss of crucial evidence, invasion of privacy, emotional distress, and increased personal vulnerability due to compromised digital security.

266.    Plaintiff seeks compensatory damages for her actual injuries, punitive damages to deter future constitutional violations, and all other relief available under 42 U.S.C. § 1983.

**The Plaintiff asserts a fifth cause of action for violation of the Fourteenth Amendment, as provided under 42 U.S.C. §1983, specifically citing the denial of due process clause against Defendant PAULA FEROLETO and SAMANTHA VENTURA.**

267.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action for paragraphs #132-216.

268.    The Fourteenth Amendment guarantees that no person shall be deprived of life, liberty, or property without due process of law. This includes the right to be present, heard, and meaningfully participate in judicial proceedings affecting fundamental liberty interests.

269.    Plaintiff requested a statutory discharge hearing concerning her involuntary commitment, where her liberty was at stake. This was a critical stage of the process requiring full constitutional safeguards and procedural fairness.

270.    Defendants PAULA FEROLETO and SAMANTHA VENTURA violated Plaintiff's right to due process by knowingly participating in, or permitting, ex parte communications and rulings during the discharge hearing outside Plaintiff's presence, depriving her of the opportunity to respond or present additional evidence.

271.    When Plaintiff returned to the courtroom after an alleged recess, she was falsely led to believe she had been discharged. Instead, Defendant FEROLETO had already rendered a ruling denying her release, based solely on the untested allegations and statements of Defendant RINGLE, without Plaintiff's participation.

272.     This ex parte conduct deprived Plaintiff of notice, a fair hearing, and the opportunity to confront her accusers, in direct violation of well-established due process rights. Such conduct creates the appearance of impropriety and judicial bias and undermines the legitimacy of the ruling.

273.     Defendant FEROLETO issued her ruling without an affidavit or verified documentation, and relied solely on unsubstantiated, conclusory allegations made by ECMCC's representative. This decision was arbitrary, capricious, and unsupported by competent legal or medical evidence.

274.     Defendant VENTURA, as assigned counsel, failed to object, advocate for Plaintiff's presence, or challenge the improper procedure, thereby abdicating her duty to ensure Plaintiff's fundamental rights were protected.

275.     Under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), judicial immunity is not absolute where the conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Defendant FEROLETO's actions fell outside the scope of judicial immunity where she presided over an ex parte deprivation of liberty without jurisdictional basis or proper filings.

276.     Defendant FEROLETO had a clearly established duty under New York Judiciary Law § 4 and federal due process jurisprudence to safeguard Plaintiff's right to be heard in court and to reject unsupported, non-adversarial submissions.

277.     The failure to adhere to these constitutional protections renders her actions unlawful and outside the bounds of judicial function. Similarly, VENTURA's inaction constituted deliberate indifference to Plaintiff's right to a fair hearing.

278.    Defendants' actions were procedurally improper, arbitrary, and egregious in nature, warranting liability under 42 U.S.C. § 1983. The denial of meaningful participation in a liberty-depriving hearing constitutes a fundamental due process violation.

279.    As a result of these violations, Plaintiff suffered severe injury, including unlawful continued confinement, emotional trauma, reputational harm, and infringement on her constitutional rights.

280.    The plaintiff seeks redress for these violations through appropriate legal channels as permitted under 42 U.S.C. §1983 for damages resulting from deprivation of constitutional rights.

### Sixth cause of action for Failure to Train and Supervise as per 42 U.S.C. §1983 and §1983 per Monell v. Department of Social Services, 436 U.S 658 (1978) Defendants ERIE COUNTY MEDICAL CENTER and/or ERIE COUNTY MEDICAL CENTER CORPORATION.

281.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action for paragraphs #132-216.

282.    To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010) (quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)). A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates [emphasis added]. Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 13-14 (2d Cir. 2015) (formal policy

officially endorsed by the municipality); Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 62 (2d

Cir. 2014) (widespread and persistent practice); Carter v. Inc. Vill. of Ocean Beach, 759 F.3d

159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); Jones v. Town of

E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification

of low-level employee's actions).). Relating to widespread and pervasive practices and using

logical inferences to impute knowledge onto policymakers, circumstantial evidence can be

sufficient to support an inference that . . . a municipal policy or custom exists." Santos v. New

York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing Dwares v. City of New York, 985

F.2d 94, 100 (2d Cir. 1993)).

283.    Defendants ECMCC are liable for an illegal seizure, *inter alia*, conducted against the

Plaintiff, and all resultant damages, under the Monell Doctrine.

284.    Furthermore, A municipality may be liable for constitutional violations under § 1983

when such violations arise from a failure to properly train or supervise employees. See City of

Canton v. Harris, 489 U.S. 378, 388 (1989).

285.    ECMCC failed to train and supervise its medical staff, admissions personnel, and

property managers on proper procedures for involuntary psychiatric commitments, patient rights,

and safeguarding personal belongings, as mandated by law. These failures directly contributed to

the violations of Plaintiff's constitutional rights. ECMCC is a licensed psychiatric facility subject

to oversight under Mental Hygiene Law Article 33 and Title 14 NYCRR § 27.6, which mandates

that staff receive adequate training on patients' legal rights, due process protections, and

admission standards under MHL § 9.27. Additionally, ECMCC is required under 14 NYCRR §

27.9 to ensure all policies and procedures related to clinical care and property management meet

minimum state standards. The deliberate failure to ensure compliance with these mandates

demonstrates a pattern of systemic neglect and institutional indifference, supporting Plaintiff's

Monell claim that ECMCC maintained a de facto policy, practice, or custom of disregarding

patient rights and failing to implement constitutionally adequate training and oversight.

## FACTUAL BACKGROUND TO CLAIM THREE

286.    On June 22, 2023, the plaintiff participated in further proceedings on an Article 10

Neglect petition, at Erie County Family Court, which unbeknownst to them, turned out to be a

non-jury trial concerning their daughter.

287.    Prior to this event, on March 3rd, 2023, the plaintiff was contacted by Vernita

Thompson, an Erie County CPS agent. During the interaction between Ms. Thompson and the

plaintiff, it was communicated that the plaintiff's daughter was at risk of being removed from her

father's home.

288.    This imminent removal stemmed from an alleged six-month investigation that had

concluded her investigation against the indicated father of the plaintiff's daughter. Ms.

Thompson further communicated to the plaintiff that her daughter only has two (2) options of

placement and that will be either through defendant ALICIA FLOOD or through the foster care

system.

289.    The plaintiff was unaware of the six-month investigation due to Ms. Thompson

failure to notify the plaintiff of a grave situation that involved her daughter.

290.    Despite the plaintiff expressing their concern for Ms. Thompson that defendant

ALICIA FLOOD posed a conflict of interest and requested that she bring her daughter to the

plaintiff's current residence instead. However, Ms. Thompson disregarded this request and

employed unlawful, unconstitutional tactics that ultimately resulted in the plaintiff's daughter being placed under the care of defendant FLOOD.

291.    In the course of the hearing on June 22, 2023, the plaintiff, who was deemed pro se on the record that day, was not afforded the opportunity to adequately prepare for the proceedings. At this critical juncture, Vernita Thompson and their appointed counsel, Amy Inzina, summoned the defendant, NICOLE ABRUZZINO, to provide testimony against the plaintiff.

292.    Prior to defendant ABRUZZINO taking the stand, Amy Inzina engaged in discussions and presented defensive arguments insinuating that the plaintiff posed a safety risk to her daughter. These objections were made with the intent to prevent the plaintiff's daughter from being released into her custody.

293.    Amy Inzina advanced these arguments asserting that Plaintiff posed a safety risk to her daughter. These arguments were based on fraudulent behavioral assessments and a fabricated diagnosis of bipolar disorder that had been unlawfully disclosed by Defendant Crisis Services. Such disclosure, made without Plaintiff's authorization, consent, or judicial order, was in violation of federal and state privacy laws, including 45 CFR §§ 164.502(a), 164.508, and 164.512 of the Health Insurance Portability and Accountability Act (HIPAA). Additionally, the disclosure violated New York Mental Hygiene Law § 33.13, which prohibits dissemination of mental health treatment records absent a specific legal exception. The use of these privileged communications to influence custody proceedings constituted a violation of Plaintiff's substantive and procedural due process rights under the Fourteenth Amendment and directly contributed to the denial of her familial liberty interests.

294.    Upon defendant ABRUZZINO taking an oath to testify against the plaintiff, she proceeded to fabricate a fictitious and misleading account concerning the plaintiff's behavior,

actions, and mental health status during their involuntary commitment at Erie County Medical

Center on dates from August 29, 2022, through September 09, 2022.

295.    Defendant ABRUZZINO alluded to the narrative, that the plaintiff orchestrated a plan

to get herself admitted into CPEP for SSI benefits. She further narrates an account that the

plaintiff was exhibiting erratic and bizarre behavior during their purported interview at ECMCC.

296.    The actions of defendant ABRUZZINO in making false statements regarding the

plaintiff's behavior and conduct, as well as fabricating a narrative that the plaintiff orchestrated a

plan to secure her admission to CPEP for the purpose of obtaining SSI benefits, constitute

complicity in a conspiracy with defendants CRISIS SERVICES, FLOOD, WATTS, JOHN DOE

OFFICERS, HANRAHAN and RINGLE to support their narrative that plaintiff was a danger to

the herself or the community.

297.    This conduct infringed upon the plaintiff's rights, specifically her right to intimate

association with her daughter, as protected under New York State law and the First Amendment.

Pursuant to CPLR § 3016(b), allegations of fraud must be stated with particularity, which is

relevant here given the nature of the claims against ABRUZZINO and the other defendants.

298.    Additionally, under New York Domestic Relations Law § 70(a), any actions that

interfere with parental rights can be actionable if they result in deprivation of custody or

visitation. The combination of false statements and conspiracy to undermine the plaintiff's

relationship with her child raises significant legal concerns under these statutes.

299.    The plaintiff then had the opportunity to cross examine defendant ABRUZZINO

about a list of names she had provided to her at the hospital, asking her to read back each name.

In this exchange, defendant ABRUZZINO correctly identified all names except for Defendant

ALICIA FLOOD. She deliberately mispronounced FLOOD's name to an unrecognizable degree,

thereby shielding FLOOD in this matter from any involvement. **PLEASE REFER BACK TO**

**PARAGRAPHS #146, #147, #148, set forth herein.**

300.     In or around July 2023, the plaintiff became aware that an ex-parte Order to Show

Cause hearing had occurred concerning the plaintiff's medical records from ECMCC on

approximately May 25, 2023, regarding the night in question.

301.     The plaintiff, who was not given the opportunity to participate in the proceedings or

voice any objections on the record to protect her privacy, experienced the disclosure of her

records to third parties under the authority of defendant LAURA FLEMING, the privacy officer

at Erie County Medical Center/Corporation.

302.     In return, defendant FLEMING failed to fulfill her obligation to provide the plaintiff

with the opportunity to exercise her due process rights. Specifically, defendant FLEMING

neglected to initiate contact with the plaintiff, thereby depriving the plaintiff of her right to object

to the disclosure of these records to individuals known to be involved in criminal activities.

303.     This failure on the part of the defendant FLEMING resulted in a violation of the

plaintiff's constitutional rights under the due process clause and made her complicit in the

conspiracy with defendants ABRUZZINO and FLOOD, and external parties, notably Vernita

Thompson and Amy Inzina.

304.     This conduct resulted in further infringement upon the plaintiff's rights, specifically

her right to intimate association with her daughter. The unauthorized disclosure of information

led to additional discriminatory implications against the plaintiff, suggesting that she posed a

safety risk to her daughter. This narrative is particularly troubling given that the alleged safety

concerns did not similarly apply to the plaintiff's son, further corroborating the plaintiff's claims

of collusion and conspiracy by defendants FLOOD and co-defendants ulterior motives set forth herein.

305.    Upon further examination, the Article 10 Neglect proceedings initiated by Vernita Thompson were jurisdictionally defective. Ms. Thompson's non-compliance with statutory requirements under the FCA §§ 1035, 1036 and Family Court Act §1023 she failed to serve the plaintiff and the respondent to the matter in accordance with CPLR 308, thereby depriving the court of personal jurisdiction over her daughter. *Under New York law, jurisdiction is not acquired absent proper service. See Nationstar Mortgage LLC v. Esdelle, 186 A.D.3d 1384 (4th Dep't 2020) ("A court lacks jurisdiction where service is defective").*

306.    The action of defendant FLEMING also constituted a blatant Fourth Amendment violation that protects against unreasonable searches and seizures. There was no probable cause or established jurisdiction that would necessitate the breach of this amendment or her rights to privacy.

307.    The plaintiff was not the respondent in this Erie County Child Protection investigation and the CPS agents in question did not properly gain jurisdiction over her daughter in an Article 10 neglect proceedings. The plaintiff did not waive her rights in these proceedings.

308.    On or about July 27, 2023, the plaintiff was forced to observe these records, unlawfully disclosed under the custody and control of Vernita Thompson, before being turned over to the custody of the presiding judge causing immediate distress and anxiety in the plaintiff that resulted in more severe discriminatory practices against the plaintiff.

309.    On or around January of 2024, the plaintiff filed for an amendment and addendum to her medical records pertaining to her involuntarily commitment at ECMCC. The request was made in the effort to ensure complete transparency and rectify inaccuracies, omissions that were

substantiated by evidence, after having the opportunity to obtain her authorized full medical file in October of 2023, despite ECMCC disclosing the aforementioned unauthorized records in August of 2024, that contained records that were not available on three separate occasions. **SEE EXHIBIT L.**

310.    In April 2024, ECMCC issued a final denial of Plaintiff's amendment request pursuant to 45 CFR § 164.526, falsely asserting that none of the treating physicians specifically Sutton, HANRAHAN, PRIDGEON, and RINGLE were still employed by the facility. This representation was materially inaccurate. Subsequent investigation revealed that all listed providers, except for Defendant JULIA RINGLE, remained affiliated with ECMCC, either as direct employees or independent contractors. Defendant RINGLE had transitioned to employment with BestSelf Behavioral Health, Inc. The misrepresentation of employment status formed the basis for denying Plaintiff her federally protected right to amend her medical records, constituting both a violation of HIPAA and evidence of deliberate institutional misconduct. **SEE EXHIBIT M**.

311.    Under the Health Insurance Portability and Accountability Act (HIPAA), specifically 45 CFR § 164.526, individuals have the right to request amendments to their protected health information (PHI) maintained by covered entities. This regulation is crucial in ensuring that patients can correct inaccuracies in their medical records, which can significantly impact their care and treatment.

312.    Even if a physician is no longer working at a facility, hospitals are legally obligated under 45 CFR § 164.526 to honor requests from patients seeking amendments to their PHI. Any failure to do so—especially if accompanied by misleading statements regarding employment

status could constitute fraud and raise serious ethical questions about the institution's practices regarding patient rights and record management.

313.     This pattern of denial and misrepresentation by ECMCC, when taken in conjunction with its prior unauthorized disclosures and refusal to correct medical records, reveals an institutional effort to suppress evidence of wrongdoing. When a covered entity's actions are linked to discriminatory animus or retaliatory conduct, such behavior may give rise to liability under both HIPAA enforcement theories and 42 U.S.C. § 1983. See *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204 (9th Cir. 2020) (acknowledging interplay of HIPAA violations and constitutional injury claims when tied to state actors or policies).

## First Cause of Action for Violation of the Fourteenth Amendment as per 42 U.S.C. §1983 and/or § 1985 (2) and/or §1985(3)  for the conspiracy to deprive Plaintiff of constitutional rights by Defendants NICOLE ABRUZZINO, LAURA FLEMING, and CRISIS SERVICES.

314.     Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action for paragraphs #286-313.

315.     To maintain a claim for conspiracy a plaintiff must establish: (1) an agreement between two or more persons; (2) intent to commit an unlawful act; (3) at least one overt act taken in furtherance of that agreement; and (4) knowledge and participation by each conspirator; See Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).

316.     Defendant ABRUZZINO knowingly and willfully entered into an agreement with co-conspirators, including but not limited to Defendants CRISIS SERVICES and FLEMING, to interfere with Plaintiff's protected liberty interest in familial association in violation of the Fourteenth Amendment.

317.    The objective of this agreement was to commit the unlawful act of depriving Plaintiff

of custody of her daughter by misrepresenting Plaintiff's mental health status through false

testimony and the unauthorized disclosure of medical records.

318.    In furtherance of this conspiracy, Defendant ABRUZZINO took at least one overt act

by providing fabricated and misleading testimony in Erie County Family Court under oath,

falsely portraying Plaintiff as mentally unstable and a danger to her child, thereby influencing the

court's custodial determination.

319.    Defendant FLEMING also committed an overt act in furtherance of the conspiracy by

unlawfully disclosing Plaintiff's confidential mental health records without consent or valid legal

process, in violation of HIPAA (45 CFR §§ 164.502, 164.508) and New York Mental Hygiene

Law § 33.13, with knowledge that the records would be used to undermine Plaintiff in ongoing

legal proceedings.

320.    Each Defendant had knowledge of and intentionally participated in this agreement.

ABRUZZINO, as a treating provider, knew her testimony was false and misleading. FLEMING,

as ECMCC's designated privacy officer, had a duty to protect Plaintiff's health information but

nonetheless disclosed it with the intent to cause legal harm. CRISIS SERVICES originated and

disseminated the false behavioral assessment and fraudulent diagnosis that formed the basis for

the conspiracy's narrative.

321.    The actions of Defendants were not isolated but were coordinated and aimed at

achieving the shared goal of depriving Plaintiff of custody through unlawful means, thereby

satisfying all elements of conspiracy under § 1983 and/or § 1985.

322.    As a direct and proximate result of this conspiracy, Plaintiff suffered violation of her

constitutional rights, including infringement of her liberty interest in the care and custody of her

child, denial of procedural and substantive due process, and emotional and reputational harm.

See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970); *Sanitation & Recycling Indus., Inc.*

*v. City of New York*, 107 F.3d 985, 999 (2d Cir. 1997).

**Second Cause of Action for Violation of the Fourteenth Amendment as per 42 U.S.C. §1983**

**and/or § 1985 (2) and/or §1985(3) for the conspiracy to deprive Plaintiff of constitutional**

**rights by Defendants LAURA FLEMING, JANE AND JOHN DOE'S and ECMCC.**

318.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint

with full force and effect as if set forth at length in this cause of action.

319.    To maintain a claim for conspiracy a plaintiff must establish: (1) an agreement between

two or more persons; (2) intent to commit an unlawful act; (3) at least one overt act taken in

furtherance of that agreement; and (4) knowledge and participation by each conspirator; See

Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).

319.    Under 45 CFR § 164.526(a), a patient has the right to request an amendment to their

protected health information (PHI) when it is inaccurate or incomplete. Covered entities must

timely evaluate such requests and may only deny them under specific, lawful grounds.

320.    Defendant ECMCC, acting through its HIPAA Privacy Officer LAURA FLEMING and

other unknown employees (John and Jane Does), falsely claimed that none of Plaintiff's treating

clinicians, including Drs. Sutton, Hanrahan, and Pridgeon were still employed by ECMCC, in

order to justify denying her HIPAA amendment request. In truth, only Dr. Julia Ringle had left

the institution. The others remained affiliated either as contractors or employees.

321.    These knowingly false statements misled Plaintiff regarding her right to request

corrections to her records. ECMCC and FLEMING, while acting under color of state law as a

public health institution and state actor, failed to fulfill their legal and constitutional obligations, thereby depriving Plaintiff of due process under the Fourteenth Amendment.

323.    These actions constitute both a procedural and substantive due process violation under the Fourteenth Amendment. Additionally, to the extent these acts were driven by retaliatory or discriminatory motives such as Plaintiff's efforts to challenge her prior involuntary commitment, they may also implicate equal protection rights and support a claim under § 1985(3). See *Britt v. Garcia*, 457 F.3d 264, 270 (2d Cir. 2006).

324.    Plaintiff seeks compensatory damages for the actual harm suffered, punitive damages to deter future constitutional violations, and declaratory relief that her rights under federal law were violated.

### Third cause of action for Failure to Train and Supervise as per 42 U.S.C. §1983 and §1983 per Monell v. Department of Social Services, 436 U.S 658 (1978) Defendants ERIE COUNTY MEDICAL CENTER and/or ERIE COUNTY MEDICAL CENTER CORPORATION.

325.    Plaintiff repeats and reiterates each and every foregoing allegation of this complaint with full force and effect as if set forth at length in this cause of action for paragraphs #132-216.

326.    To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010) (quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)). A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to

the rights of the plaintiff and others encountering those subordinates [emphasis added].

Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 13-14 (2d Cir. 2015) (formal policy

officially endorsed by the municipality); Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 62 (2d

Cir. 2014) (widespread and persistent practice); Carter v. Inc. Vill. of Ocean Beach, 759 F.3d

159, 164 (2d Cir. 2014) (failure to train amounting to deliberate indifference); Jones v. Town of

E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) (policymaking official's "express" or "tacit" ratification

of low-level employee's actions).). Relating to widespread and pervasive practices and using

logical inferences to impute knowledge onto policymakers, circumstantial evidence can be

sufficient to support an inference that . . . a municipal policy or custom exists." Santos v. New

York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing Dwares v. City of New York, 985

F.2d 94, 100 (2d Cir. 1993)).

327.    In this case, Plaintiff's constitutional rights were violated as a direct result of

ECMCC's failure to train and supervise its employees, specifically, medical staff, administrative

personnel, and privacy officers on the lawful handling of involuntary psychiatric commitments,

maintenance and amendment of protected health information (PHI), and compliance with privacy

protections under HIPAA (45 CFR §§ 164.502, 164.508, 164.512, and 164.526) and New York

Mental Hygiene Law § 33.13.

328.    ECMCC exhibited deliberate indifference to Plaintiff's rights by allowing its personnel

to: (a) unlawfully disclose confidential mental health information without proper legal

authorization; (b) obstruct lawful requests to amend medical records based on false claims of

physician unavailability; (c) misrepresent the employment status of treating providers; and

(d) engage in retaliatory conduct through administrative gatekeeping and suppression of

unfavorable facts.

329.    The violations alleged were not isolated incidents but stem from a broader failure in ECMCC's internal policies and training programs, amounting to a custom or practice under *Monell*. Defendant LAURA FLEMING, acting in her official capacity as Privacy Officer, failed to carry out federally mandated duties and allowed protected medical information to be weaponized in adversarial proceedings without due process.

330.    ECMCC's failure to implement safeguards or internal checks to prevent unauthorized disclosures and mismanagement of PHI reflects a pattern of institutional misconduct that rises to the level of deliberate indifference. See *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (municipal liability lies where failure to train amounts to deliberate indifference to constitutional rights).

331.    As a direct and proximate result of ECMCC's failure to adequately train and supervise its staff, Plaintiff suffered constitutional injuries including but not limited to: (a) violation of her Fourteenth Amendment right to due process; (b) unlawful invasion of privacy under the Fourth Amendment; (c) infringement of her right to intimate familial association; and (d) retaliatory discrimination in child custody and medical access proceedings.

332.    Plaintiff seeks compensatory damages for actual harm suffered, punitive damages to deter future misconduct, and constitutional injury damages pursuant to 42 U.S.C. § 1983 for the violations described herein. Additionally, Plaintiff seeks declaratory and injunctive relief to ensure ECMCC adopts lawful training, privacy, and record management protocols consistent with federal and state law.

## CHEVRON DEFERENCE DOCTRINE

Given the U.S Supreme Court's recent shift in Chevron Deference Doctrine, this court must independently assess the legality of the defendant's actions, without undue deference to their interpretations. The court must ensure that the defendants' actions are consistent with both statutory and constitutional mandates, particularly where fundamental rights are at stake.

**WHEREFORE**, Plaintiff ZAKKIYYA CARTER demands judgment on the above counts against the Defendants, their units, their officers, employees, against and other persons acting in concert or participation with them as stated above, and award the following amounts:

a. Compensatory damages in favor of the Plaintiff in an amount to be determined by a jury;

b. Exemplary damages in favor of the Plaintiff;

c. Costs of this action; and such other relief as the court may deem appropriate.

**Certification and Closing** Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _8 - 11- 2025_

_____
Signature of Plaintiff

Zakkiyya Carter

_____
Printed Name of Plaintiff

# EXHIBIT A

MR# M000660864        Account # V00006980679        Report# 0830-0508

**ERIE COUNTY MEDICAL CENTER CORPORATION**
**MH-Mental Health Assessment**
462 Grider St., Buffalo, NY 14215
(716) 898-3000

**Patient's Name** CARTER, ZAKKIYYA
**Report#** 0830-0508
**Date of Birth:** ▌▌▌▌
**Attending Physician:** GOKHALE, VINAYAK S MD
**Dictating Provider:** SUTTON, MARK C DO
**Primary Provider:** DAO, TINH T MD, (RF)

**MR#:** M000660864/**Account #:** V00006980679
**Age/Sex:** 35/F
**Admission Date/Time:** 08/30/22 1735
**Admitting Service:** PSYCHIATRY & BEHAVIORAL HEAL
**Dictating Date/Time:** 08/30/22 1029

---

## CPEP Psycho-Soc CPEP/RN Assess
### SW General Information
**Initial info obtained by:** Kelly Lawson LMHC
**Hearing or Visual Impairment:** No
**Address Verified/Placement Com:**
323 Dewey Ave Buffalo NY 14214
**Verified Telephone Numbers:** 716-472-4081
**Interpreter needed?:** No

### SW Living Situation/Env
**Living Situation:** Private Residence
**Homeless/on street in past:** No
**Household Composition:**
lives with her 2 children (14yr old and 8yr old)
**Are firearms accessible:** No

### SW Employment/Edu History
**Is the patient employed?:** No
**Education Level:** Some College - No Degree

### SW APIC Referral
**Is pt developmentally disabled:** No
**Want to make an APIC referral?:** No

### SW Significant History
**Pt ever had traumatic exp:** Unable to Obtain
**Legal Assessment:**
denies legal issues

### SW Substance History
**Alcohol:** Past Month
**Sedatives/Hypnotics:** No History of Use
**Opiates/Heroin:** No History of Use
**Tobacco:** Lifetime
**Cannabis:** Past Month
**Cocaine/Crack:** No History of Use
**Amphetamines:** Lifetime
**Hallucinogens/Inhalents:** Lifetime
**Other Substances Used:** Lifetime
**History of Substance Use:**
Pt denies substance abuse. Pt admits she smokes marijuana daily and drinking
alcohol occasionally. ▌▌▌▌▌▌▌▌▌▌▌

MR# M000660864        Account # V00006980679        Report# 0830-0508

## SW Audit C/Contact/Summary
**How often have alcoholic drink:** 2-4 Times a month
**How many drinks on typical day:** 3 or 4
**How often 6+/8+ drinks at once:** Less than Monthly
**Your Audit-C Score:** 4
**Type of Collateral:** Friend
**Name of Collateral Contact:** Tiffany, friend
**Collateral Contact's Phone/Fax:** 716-370-5861
**Current/Recent Outpatient Link:**
denies legal issues
**Psychosocial Summary:**



. Per triage note there is a police report of pt having a DWI a couple days ago.

Pt is unable to safety plan at this time. Pt is preoccupied with the cops taking her away and the conspiracy from "these people" to get her kids.

MR# M000660864          Account # V00006980679          Report# 0830-0508
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**RN Triage Arrival**
**Preferred Name:** *Zakkiyya*
**Preferred Pronoun:** She/Her
**Legal Status on Arrival:** 9.45

**RN Triage Safety/Weapons Check**
**Contraband found on check:**
none

**RN Triage Nicotine Use**
**Smoking Status:** Current every day smoker
**Amount pt smokes in packs/day:** 1 pack per day

**RN Triage Alcohol Use**
**Alcohol Use:** Yes
**How long since your last drink:** Few hours or less

**RN Triage CPEP Priority/Note**
**Response to Pt Booklet offered:** Declined by patient
**CPEP Triage Note:**



**RN Initl Pain**
**Is patient experiencing pain:** No
**Pain Loc/Desc in pt own words:**
Denied

**RN Initl Narrative**
**Additional pt status comments:**



**RN Last Violence Risk**
**Violence Risk Factors:** Irritable, Boisterous

**RN Last Fall/Safety Colors**
**Fall Risk Factors:**    Able to Rise-Single Move
                          No Falls Risk Behaviors

MR# M000660864        Account. # V00006980679        Report# 0830-0508

**Calculated Fall Risk:** 0
**Clinical Fall Risk?:** NO
**MD notified:** No
 **Bracelets Applied:** None

## Physician Comments
I have reviewed the above RN/Social Worker documentation, and discussed it with the writers. Please see below assessment for details of MD comments.

## History of Present Illness
**General**
**Triage Asx/CC**
arrives on 9.45 papers for delusional behavior. Pt belives FBI is chasing her and is agitated and aggressive.
**Primary Care Physician**
Dao,Tinh T MD,(RF)
**History Source:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Exam Limitations:** clinical condition

## History of Present Illness
**Initial Comments**



**Allergies:**
**Coded Allergies:**
    No Known Allergies (Verified , 5/21/15)
**Current Prescriptions**
None
**Visit Narrative**

MR# M000660864        Account # V00006980679        Report# 0830-0508

------------------------------------------------------------------

| Urine Cannabinoids Screen | | POSITIVE (NEGATIVE) H |

## Mental Status Exam
### Mental Status Exam
**Appearance:** disheveled, well nourished, appears stated age, good eye contact, fair hygiene
**Attitude:** semi-cooperative, guarded, defiant/oppositional, externalizing
**Behavior:** inappropriate, tenuous, hyperactive/restless, disinhibited, dramatic, manipulative
**Speech:** coherent, spontaneous, rapid, pressured
**Mood:** irritable, angry
**Affect:** expressive
**Thought Process:** circumstantial, goal directed, concrete
**Thought Content:** REPORTS: paranoia, delusions; DENIES: suicidal ideation, homicidal ideations (denies however was reportedly trying to attack son's father in community)
**Perceptual Abnormalities:** NO: auditory hallucinations, visual hallucinations

### Cognitive Functioning
**Orientation:** Oriented to: Time, Place, Person
**Memory:** intact
**Intellectual Functioning:** average
**Insight:** temporarily impaired
**Judgement:** temporarily impaired

### Risk Assessment
#### Screening of Suicide Risk
**Wish for death/sleep/not wake:**   No, including last 6 months
**Had thoughts of killing self:**   No, including last 6 months
**Access to means:**   No
**Done/started/prepared end life:**   No
**Done something to harm self:**   No

### Chronic/Acute Risk Factors
**Risk Factors:**   Low Depression/anhedonia
Low Recent losses/bad news
Low Hx of trauma/maltreatment
Low Lack of support/isolation
Low Substance Withdrawal
Low Alcohol/substance abuse
Low Physical illness/pain
Low H/O aggressive tendencies
Medium Mental Illness/active Sx
Medium Extreme anger-current
Medium History of Impulsivity
0 (non-factor) Family Hx of Suicide
0 (non-factor) Feelings of guilt/shame
0 (non-factor) Feelings of hopelessness
0 (non-factor) Command halluc./30days
0 (non-factor) Local suicide epidemic
0 (non-factor) Barriers to treatment

### Protective Factors

MR# M000660864        Account # V00006980679        Report# 0830-0508

**Protective Factors:**  Low Supportivefamily/friends;
0 (non-factor) Compliant with psy tx:
0 (non-factor) Compliant with psy meds:
0 (non-factor) Pos. therap. alliance:
0 (non-factor) Insight into problems:
0 (non-factor) Resilience to stressors:
0 (non-factor) Improved mood:
0 (non-factor) Improved coping skills:
0 (non-factor) Resolved feeling of loss:
0 (non-factor) Realistic future plans:
0 (non-factor) Cult. discourage suicide:
0 (non-factor) Rel. discourage suicide:

## Overall Assessment of Risk
**To self if discharged home:**  MEDIUM
**Overall Risk Narrative:**



## Harm to Others/Aggressive Beh.
**Risk of Harm to Others:**    Low Antisoc/Borderline traits
Low Subst abuse/withdrawal
Medium Directed anger/hostility
Medium Hx of Violence/6 mths
Medium Impulsivity
Medium Violent ideat./past 6 mth
0 (non-factor) Hx/mandated tx for D.V.
0 (non-factor) Hx/mandated tx for anger
0 (non-factor) Brain Injury (e.g TBI)

**Most recent violent episode:**  Mixed
**Risk of aggression if DC home:**  HIGH
**Harm/Aggression Narrative:**

## Diagnosis/Plan
## Diagnosis
**Primary Diagnosis:**
**Secondary Diagnosis**

**Medical Diagnosis:** none
**Dual Dx (developmental d/o):** No

MR# M000660864          Account # V00006980679          Report# 0830-0508

████████████████████████████████████████

████████████████████████████████

## Past History
**Past Med/Surg/Psy History**
**Inpatient Psychiatric History?:** No
**Outpatient Psychiatric History:** No
**Psych History:** reviewed/found not pertinent
**Past Med/Surg History:** reviewed/found not pertinent
**Handedness:** right

## Family & Social History
**Biological Fam Psych History:** schizophrenia (In mother)
**Marital Status:** Single
**Substance:** ABUSE: Alcohol, Marijuana; DENIES: Amphetamines, Benzodiazepines, Cocaine, Heroin, Nicotine, Opiates, OTC Medications, Prescription Medications, Other

## Physical Examination
**Results**
**Vital Signs**

**Vital Signs**

| Date Time | Temp | Pulse | Resp | B/P (MAP) | Pulse Ox | O2 Delivery | O2 Flow Rate | FiO2 |
|-----------|------|-------|------|-----------|----------|-------------|--------------|------|
| 8/30/22 15:52 | 98.8 | 80 | 18 | 121/77 | 99 | | | |

**Laboratory Results**

### Laboratory Tests

| Test | 8/29/22 22:32 | 8/30/22 09:15 |
|------|---------------|---------------|
| SARS-CoV-2 (Rapid) | Negative (Negative) | |
| Urine HCG, Qualitative | | NEGATIVE (NEGATIVE) |
| Urine Opiates Screen | | NEGATIVE (NEGATIVE) |
| Urine Oxycodone Screen | | NEGATIVE (NEGATIVE) |
| Urine Methadone Screen | | NEGATIVE (NEGATIVE) |
| Urine Fentanyl Screen | | NEGATIVE (NEGATIVE) |
| Urine Barbiturates Screen | | NEGATIVE (NEGATIVE) |
| Urine Phencyclidine Screen | | NEGATIVE (NEGATIVE) |
| Urine Amphetamines Screen | | NEGATIVE (NEGATIVE) |
| Urine Benzodiazepines Screen | | NEGATIVE (NEGATIVE) |
| Urine Cocaine Metabolite Screen | | NEGATIVE (NEGATIVE) |

MR# M000660864        Account # V00006980679        Report# 0830-0508

Legal Status: 927

## Attending Statement (Psych)
**Attending Statement**
**Attending Statement:** I have examined the patient, I agree with resident assessment, I agree with resident plan
**Additional changes**

She is at risk of acting on delusions impulsively without regard to safety and with aggression. She requires hospitalization for safety and stabilization. Will admit to inpatient psychiatry on 9.27 legal status and start Risperdal 1mg po QHS and encourage compliance.

**DRAGON DISCLAIMER:** Dragon voice-recognition software may have been used to prepare this typewritten note. Although each note is personally scanned for syntactic or grammatical errors, unintended but conspicuous translational errors can occur. Please contact ECMC if there are any questions about the contents of this note.

SUTTON,MARK C DO                         Aug 30, 2022 10:29
HANRAHAN,LAURA C MD                   Aug 30, 2022 17:34

Attn Physician: GOKHALE,VINAYAK S MD

<Electronically signed by MARK C SUTTON DO>, 08/30/22 1637
**<Electronically signed by LAURA C HANRAHAN MD>, 08/30/22 1802**

,

PC Physician: DAO,TINH T MD, (RF)
Ref Physician:
Copies To:
~

# EXHIBIT B



Case 1:24-cv-01237-JLS    Document 1    Filed 06/26/25    Page 87 of 120



# EXHIBIT C

MR# M000660864       Account # V00006980679       Report# 0902-1045

---

## ERIE COUNTY MEDICAL CENTER CORPORATION
### MH-Psych Assessment & History
462 Grider St.,Buffalo, NY 14215
(716) 898-3000

**Patient's Name** CARTER,ZAKKIYYA
**Report#** 0902-1045
**Date of Birth:** ▮▮▮▮▮
**Attending Physician:** RINGEL,JULIA A DO
**Dictating Provider:** RINGEL,JULIA A DO
**Primary Provider:** DAO,TINH T MD, (RF)

**MR#:** M000660864/**Account #:** V00006980679
**Age/Sex:** 35/F
X**Admission Date/Time:** 08/30/22 1735
**Admitting Service:** PSYCHIATRY & BEHAVIORAL HEAL
**Dictating Date/Time:** 09/02/22 1513

---

## General
**Date of Service:** Sep 2, 2022
**Primary Care Physician**
Dao,Tinh T MD,(RF)
**Diagnosis** ████████████████████████

## History of Present Illness
As per CPEP documentation:



████████████████████████████████████████. Police report that couple of days ago she was given DWI, pt. sates "it was illegal". Pt. will be evaluated later.

# EXHIBIT D

Form OMH 471 (MH) (11-97) Page 2

State of New York
OFFICE OF MENTAL HEALTH

M000660864
CBAMERIGP
08/30/22

CARTER,ZAKKIYYA

State of New
OFFICE OF MENTA/

DOB: _____ 35    SEX:F

...TION FOR INVOLUNTARY
...ON MEDICAL CERTIFICATION
...n 9.27 Mental Hygiene Law

V00006980679    ERCPEP

## II. GENERAL INFORM

### A. Mental Hygiene Legal Service

The Mental Hygiene Legal Service is an agency of the New York State Supreme Court which provides protective legal services, advice and assistance, including representation, to all patients admitted to psychiatric facilities. Patients are entitled to be informed of their rights regarding hospitalization and treatment, and have a right to a court hearing, to be represented by a lawyer, and to seek independent medical opinion.

There is a Mental Hygiene Legal Service office in many psychiatric hospitals. Where there is no office at the hospital, a representative of the Service visits periodically and frequently. Any patient or anyone in his or her behalf may see or communicate with a representative of the Service by telephoning or writing directly to the office of the Service or by requesting someone on the staff of the patient's ward to make such arrangements for him or her. The Mental Hygiene Legal Service representative for this hospital may be reached at: _____ .

### B. Reimbursement

The patient is legally responsible for the cost of care. Additionally responsible are the patient's spouse and in some cases the parents of a patient under the age of 21. Also legally responsible are the committee, guardian, or trustee of a trust fund established for the support of the patient, or any fiduciary or payee of funds for the patient.

Charges may be waived or reduced when there is inability to pay. Any person who applies for a waiver or reduction of charges must cooperate in a financial investigation to determine ability to pay.

## PART A    Application for Admission

I hereby apply for the admission of _Zakkiyya Carter_
(Name of person)

to _ECMC_ , a hospital providing services for the mentally ill.
(Name of Hospital)

My reasons for applying for admission of this person are as follows:

Under penalty of perjury, I attest that the information supplied on this application is true to the best of my knowledge and belief.

Signature of Applicant _Vaugne Cnlla-Jones_

Relationship/Title _Psychiatric Case Manager_

Date _8_ _30_ _22_
MO.  DAY  YEAR

Address _462 Ginder St Bf NY 14214_

## PART B    Psychiatrist's Confirmation of Need for Involuntary Care and Treatment in a Hospital

I HAVE EXAMINED THE ABOVE-NAMED PERSON PRIOR TO ADMISSION* AND CONFIRM:

- that the person is in need of involuntary care and treatment in a hospital providing inpatient services for the mentally ill; and
- that as a result of his or her mental illness, the person poses a substantial threat of harm to self or others ("substantial threat of harm" may encompass (i) the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, or (ii) the person's history of dangerous conduct associated with noncompliance with mental health treatment programs).

Signature _____ _Ringel_

Date _09_ _08_ _22_    Time _4:16_ _A.M._
MO.  DAY  YEAR            P.M.

*NOTE: Part B must be completed for new admissions and for conversions of already-admitted patients to §9.27 Involuntary Status.

ADM LGL 021

Form OMH 471 (MH) (11-97)

State of New York
VITAL HEALTH

# APPLICATION FOR
# INVOLUNTARY ADMISSION ON MEDICAL
# CERTIFICATION

### Section 9.27 Mental Hygiene Law

No.
tre
rec.

08/30/22
M000660864                    CBAMERIGP
CARTER ZAKKIYYA
DOB:        35        SEX:F
V00006980679                  PSY

of care and
da without

## I. GENERAL PROVISIONS FOR INVOLUNTARY ADMI

**A. Standard for Admission**

A person alleged to be mentally ill and in need of involuntary care and treatment may be admitted to a hospital providing inpatient services for the mentally ill, upon the certificates of two examining physicians accompanied by an application for admission for such person.

- "In need of involuntary care and treatment" means that the person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he or she is unable to understand the need for such care and treatment.
- The person in need of involuntary care and treatment must, as a result of his or her mental illness, pose a substantial threat of harm to self or others.

**B. Application**

The application must be made within 10 days prior to admission by:
- any person with whom the person alleged to be mentally ill resides;
- the father or mother, husband or wife, brother or sister or the child of any such person or the nearest available relative;
- the committee of such person;
- an officer of any public or well recognized charitable institution or agency or home in whose institution the person alleged to be mentally ill resides;
- the director of community services or social services official, as defined in the social services law, of the city or county in which any such person may be;
- the director of the hospital or of a general hospital, as defined in article twenty-eight of the public health law, in which the patient is hospitalized;
- the director or person in charge of a facility providing care to alcoholics or substance abusers or substance dependent persons;
- the director of the division for youth, acting in accordance with the provisions of section five hundred nine of the executive law;
- subject to the terms of any court order or any instrument executed pursuant to section three hundred eighty-four-a of the social services law, a social services official or authorized agency which has, pursuant to the social services law, care and custody or guardianship and custody of a child over the age of sixteen;
- subject to the terms of any court order, a person or entity having custody of a child pursuant to an order issued pursuant to section seven hundred fifty-six or one thousand fifty-five of the family court act; or
- a qualified psychiatrist* who is either supervising the treatment of or treating such person for a mental illness in a facility licensed or operated by the Office of Mental Health (* means a physician licensed to practice medicine in NY State, who is a diplomate of the American Board of Psychiatry and Neurology or is eligible to be certified by that Board, or who is certified by the American Osteopathic Board of Neurology and Psychiatry or is eligible to be certified by that Board).

**C. Certification by Two Examining Physicians**

The application must be supported and accompanied by two Certificates of Examining Physician (Form 471A). The examinations may be conducted jointly, but each examining physician must execute a separate certificate. If the examining physician knows that the person under examination has received prior treatment, s/he must, if possible, consult with the physician or psychologist furnishing such prior treatment.

The required examinations must be made within 10 days prior to the date of the patient's admission to the hospital.

A person is disqualified from acting as an examining physician if:
- he or she is not licensed to practice medicine in New York State.
- he or she is a relative of the person applying for admission, or of the person alleged to be in need of hospitalization.
- he or she is a manager, trustee, visitor, proprietor, officer, director, or stockholder of the hospital in which the patient is hospitalized or to which it is proposed to admit such person, or has any financial interest in such hospital other than receipt of fees, privileges or compensation for treating or examining patients in such hospital.
- he or she is on the staff of a proprietory hospital to which it is proposed to admit such person.

**D. Hospital Evaluation, Admission and Retention**

A physician on the psychiatric staff of the hospital, other than the original examining physicians, must examine the person alleged to be mentally ill and confirm the need for involuntary care and treatment prior to admission.

Subsequent to admission, if no request for a court hearing is made, the director may retain the patient for up to 60 days without taking other action.

If the hospital director determines that the condition of the patient requires hospitalization beyond 60 days:
- The patient may remain as a voluntary or informal patient if willing and suitable for such status.
- If the patient is unwilling or not suitable to remain as a voluntary or informal patient, the director must apply, before the end of the 60 day period, for a court order authorizing continued retention of the patient. The director must also inform the patient, the Mental Hygiene Legal Service, and others who received the original notice of the patient's commitment, that said director is applying for a court order, to give them the opportunity to request a hearing before the court, if they so desire.

*State and Federal Laws prohibit discrimination based on race, color, national origin, age, sex, or disability.*

ADM LGL.021

Form OMH 471A (2-34)

**ECMC**
ERIE COUNTY MEDICAL CENTER
CORPORATION

# CERTIFICATE OF EXAMINING PHYSICIAN

To Support an Application for
Involuntary Admission

Name: **CARTER, ZAKKIYYA**

M0006660864          08/30/22   CBAMERIGP
CARTER ZAKKIYYA
DOB:                35        SEX:F
V00006980679          ERCPEP
Address

# CERTIFICATION

I, _Rebecca Hicks, MD_                          , hereby certify that:
    (Name of Examining Physician)

1. I am a physician licensed to practice medicine in New York State.

2. I have with care and diligence personally examined the above named person

    on: 08 | 30 | 22     at   _ECMC_
        MO. | DAY | YEAR              (place where examined)

3. I find:
    a. this person is in need of involuntary care and treatment in a hospital providing inpatient services for the mentally ill *("in need of involuntary care and treatment" means that the person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he or she is unable to understand the need for such care and treatment);* and

    b. as a result of his or her mental illness, this person poses a substantial threat of harm to self or others *("substantial threat of harm" may encompass (i) the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, or (ii) the person's history of dangerous conduct associated with non-compliance with mental health treatment programs).*

4. I have formed my opinion on the basis of facts and information I have obtained (described below and on the reverse side) and my examination of this person.

5. I have considered alternative forms of care and treatment but believe that they are inadequate to provide for the needs of this person, or are not available.

6. If this person has to my knowledge received prior treatment, I have, insofar as possible, consulted with the physician or psychologist furnishing such prior treatment.

7. To the best of my knowledge and belief, the facts stated and information contained in this certificate are true.

| Signature | Print Name Signed _Rebecca Hicks_ | Title _MD_ |
|---|---|---|
| Address _462 Grider st Buffalo NY_ | Phone Number _716 898 3465_ | Date 08 Mo. 30 Day 22 Yr. | Time 11:54 Hr. Min AM PM |

ADMLGL 041                    M0006660864              V00006980679

Form OMH 471A (2-94)

**ECMC**
Erie County Medical Center
CORPORATION

# CERTIFICATE OF EXAMINING PHYSICIAN

Name: **CARTER, ZAKKIYYA**

M000660864    08/30/22    CBAMERIGP
**CARTER,ZAKKIYYA**
DOB:▮▮▮▮▮  35    SEX:F
V00006980679    ERCPEP
Address

To Support an Application for
Involuntary Admission

## CERTIFICATION

I, _Laura Hanrahan, MD_ , hereby certify that:
(Name of Examining Physician)

1. I am a physician licensed to practice medicine in New York State.

2. I have with care and diligence personally examined the above named person
   on: | 0 8 | 3 0 | 2 2 |  at _ECMC_
        MO   DAY  YEAR       (place where examined)

3. I find:
   a. this person is in need of involuntary care and treatment in a hospital providing inpatient services for the mentally ill *("in need of involuntary care and treatment" means that the person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he or she is unable to understand the need for such care and treatment); and*
   b. as a result of his or her mental illness, this person poses a substantial threat of harm to self or others *("substantial threat of harm" may encompass (i) the person's refusal or inability to meet his or her essential need for food, shelter, clothing, or health care, or (ii) the person's history of dangerous conduct associated with non-compliance with mental health treatment programs).*

4. I have formed my opinion on the basis of facts and information I have obtained (described below and on the reverse side) and my examination of this person.

5. I have considered alternative forms of care and treatment but believe that they are inadequate to provide for the needs of this person, or are not available.

6. If this person has to my knowledge received prior treatment, I have, insofar as possible, consulted with the physician or psychologist furnishing such prior treatment.

7. To the best of my knowledge and belief, the facts stated and information contained in this certificate are true.

| Signature | Print Name Signed | Title |
|---|---|---|
|  | _Laura Hanrahan_ | _MD_ |

| Address | Phone Number | Date | Time |
|---|---|---|---|
| _462 Grider St. Buffalo, NY_ | _(716) 898-3465_ | 08 30 22 Yr. | Hr. Min. AM PM |

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

ADM.LGL.041    M000660864    V00006980679

# EXHIBIT E

ECMC    462 GRIDER STREET | BUFFALO, NEW YORK 14215        ECMC.EDU
(716) 898-3000 | (716) 898-5178 FAX

**<u>Via Secure Electronic Mail Only</u>**

July 22, 2024

Ms. Carter
thaqueen6262@gmail.com

   Re: July 15, 2024
     *FOIL request*

Dear Ms. Carter:

  We acknowledge receipt of your electronic correspondence, dated July 15, 2024, requesting certain materials from Erie County Medical Center Corporation ("ECMCC") under New York's Freedom of Information Law ("FOIL"). Specifically, your correspondence requested "a copy of the Involuntary Admission on Medical Certification document that pertains to my commitment at this facility on August 29, 2022 to September 09, 2022."

  We are currently in the process of identifying records responsive to your request and which may be available to you under FOIL. We estimate that in twenty (20) business days from the date of this letter, we will: 1) complete your request; 2) determine the availability of records responsive to your request; or 3) notify you in the event we require additional time to locate, assemble and review responsive records.

  ECMCC reserves the right to except from disclosure records and portions of records that are exempt under FOIL, applicable provisions of the Public Authorities Law or other applicable laws and regulations, though we are not aware of any exemptions from disclosure at this time.

        Very truly yours,

        Alexandra C. Herr
        Acting FOIL Records Officer



6/25/25, 5:57 PM                                                          Gmail - FOIL Request

 Gmail                                      Ms. Carter <thaqueen6262@gmail.com>

## FOIL Request
8 messages

**Herr, Alexandra** <aherr@ecmc.edu>                         Mon, Aug 19, 2024 at 2:57 PM
To: "thaqueen6262@gmail.com" <thaqueen6262@gmail.com>
Cc: FOIL <foil@ecmc.edu>

Good Afternoon, Ms. Carter:

I am in receipt of your email sent to Ms. Sharp on August 16, 2024 relating to your FOIL request for records.

I apologize that the medical records department directed you to place a FOIL request for records as we do not send medical records via FOIL as it violates federal law relating to the privacy of patients. However, it is my understanding that as of August 16, 2024, the portion of your record that you have requested was re-issued to the address provided as part of your original request for records.

Should you like to request another copy, please follow the procedures outlined in our response to request medical records.

Kind Regards,

Alexandra C. Herr, Esq.

Staff Counsel

Erie County Medical Center Corporation

462 Grider Street

Buffalo, NY 14215

aherr@ecmc.edu

Ph: (716) 898-1320

Fax: (716) 898-4491

# EXHIBIT F

 Gmail

Ms. Carter <thaqueen6262@gmail.com>

## FOIL Request

**keke baby** <thaqueen6262@gmail.com>                              Mon, Aug 19, 2024 at 4:22 PM
To: "Herr, Alexandra" <aherr@ecmc.edu>

Dear Alexandra C. Herr Esq,

I am writing to formally respond to your recent correspondence regarding my Freedom of Information Law (FOIL) request for specific medical records that were not included in any of my initial files. I appreciate your efforts in reissuing the requested records; however, I must express my concerns regarding the legality and authenticity of these documents.

**Background and Context**

As you are aware, I submitted a FOIL request for certain medical records that I believe are essential for specific matters. Upon receiving your initial response, I was informed that these documents could not be provided due to public health laws. Subsequently, it has come to my attention that an unknown party has reissued these records and sent them to my address without my explicit consent or a medical record release form.

**Legal Framework**

Under New York State law, particularly the Public Health Law § 18 and the Health Insurance Portability and Accountability Act (HIPAA), patients have specific rights concerning their medical records. These laws ensure that individuals maintain control over their personal health information and establish clear protocols for the release of such information.

1. **Patient Rights Under New York Public Health Law:**

   - According to Public Health Law § 18, patients have the right to access their medical records. However, this access is contingent upon proper authorization being granted by the patient or their legal representative.

   - The law also stipulates that any disclosure of health information must be conducted in compliance with established regulations to protect patient confidentiality.

2. **HIPAA Regulations:**

   - HIPAA mandates strict guidelines regarding the handling and sharing of protected health information (PHI). Specifically, under 45 CFR § 164.508, a covered entity must obtain written authorization from a patient before disclosing PHI for purposes other than treatment, payment, or healthcare operations.

   - The absence of an executed release form raises significant concerns about whether the reissued documents comply with HIPAA requirements.

**Concerns Regarding Document Authenticity**

Given that I did not execute or consent to another medical record release form for these newly issued documents— especially following the commencement of legal action—I am compelled to question their authenticity. The sudden appearance of these records raises serious doubts about their validity and adherence to both state and federal laws governing patient privacy.

The lack of proper authorization not only undermines my rights as a patient but also poses potential legal ramifications for both myself and your institution should these documents be deemed unauthorized disclosures.

**Request for Clarification**

In light of these concerns, I respectfully request clarification on several points:

- What specific public health laws were cited as justification for initially withholding these records?

- Can you provide documentation confirming that all necessary authorizations were obtained prior to reissuing these records?

- What measures are in place at Erie County Medical Center to ensure compliance with both New York State Public Health Law and HIPAA when handling requests for medical records?

It is important to clarify that I have already completed several Medical Release forms related to the aforementioned records. According to MHL § 33.13, which governs the Records of Patients, CIOUX has provided me with my complete medical file. My Freedom of Information Law (FOIL) request was intended to confirm that the absence of the requested records was not due to them being held in a different department. Additionally, I would like to emphasize that I did not receive these records during my involuntary admission.

I appreciate your attention to this matter and look forward to your prompt response addressing my concerns.

Sincerely,

Zakkiyya Carter

[Quoted text hidden]

# EXHIBIT G



# NYSCEF Confirmation Notice
## Erie County Supreme Court



Print Out Date
6-20-25

The NYSCEF website has received an electronic filing on 09/07/2022 09:39 AM. Please keep this notice as a confirmation of this filing.

**810613/2022**
**ERIE COUNTY MEDICAL CENTER CORPORATION v. ZAKKIYYA CARTER**
**Assigned Judge: Hygiene Part MHP Mental**

## Documents Received on   09/07/2022 09:39 AM

| Doc # | Document Type |
|---|---|
| 1 | EMERGENCY APPLICATION - COMMENCEMENT (Un-Redacted per 202.5(e) or 206.5(e)) |
| 2 | NO FEE AUTHORIZATION (LETTER/ORDER/AFFIRMATION) |
| 3 | RJI -RE: 202.6(b) |

## Filing User

EMILY HARKNESS O'REILLY | eoreilly@magavern.com | 716-856-3500
1100 Rand Building 14 Lafayette Square, Buffalo, NY 14203

## E-mail Service Notifications

An email regarding this filing has been sent to the following on 09/07/2022 09:39 AM:

**EMILY HARKNESS O'REILLY - eoreilly@magavern.com**

## Email Notifications NOT Sent

| Role | Party | Attorney |
|---|---|---|
| Defendant / Respondent | ZAKKIYYA CARTER | No consent on record. |

* Court rules require hard copy service upon non-participating parties and attorneys who have opted-out or declined consent.

---

Michael P. Kearns, Erie County Clerk
Website: http://www.erie.gov/clerk

**NYSCEF Resource Center, nyscef@nycourts.gov**
Phone: (646) 386-3033 | Fax: (212) 401-9146 | Website: www.nycourts.gov/efile

Page 1 of 2

FILED: ERIE COUNTY CLERK 09/07/2022 09:39 AM    INDEX NO. 811 0613/2022

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 09/07/2022

Form QMH 467 (MH) (1-85)

State of New York
Office of Mental Health

## REQUEST FOR COURT HEARING
(Before Signing See Information Below)

Patient's Name (Last, First, M.I.)    C. No.

08/30/22
M000660864    OBAMERIGP
CARTER, ZAKKIYYA
DOB: 10/03/1986    35    SEX: F

V00006980679    ERCPEP

Facility Listing    Unit/Ward/Residence No.

| PART I | REQUEST | Admission Date | | | Current Legal Status |
|---|---|---|---|---|---|
| | | MO 9 | DAY 1 | YR 22 | 9.27 |

TO:    Facility Director

### I REQUEST THAT A COURT HEARING BE HELD TO DETERMINE WHETHER THE PATIENT NAMED ABOVE IS IN NEED OF INVOLUNTARY HOSPITALIZATION.

| Signature | Print Name Signed | If Not Patient, State Relationship | Date Signed | | |
|---|---|---|---|---|---|
| Zakkiyya Carter | Zakkiyya Carter | | MO 9 | DAY 2 | YEAR 22 |

## PART II    INFORMATION

### Mental Hygiene Legal Service

The Mental Hygiene Legal Service is an agency of the New York State Supreme Court which provides protective legal services, advice and assistance, including representation, to all patients admitted to psychiatric facilities. Patients are entitled to be informed of their rights regarding hospitalization and treatment, and have a right to a court hearing, to be represented by a lawyer, and to seek independent medical opinion.

There is a Mental Hygiene Legal Service office in many psychiatric hospitals. Where there is no office at the hospital, a representative of the Service visits periodically and frequently. Any patient or anyone in his or her behalf may see or communicate with a representative of the Service by telephoning or writing directly to the office of the Service, or by requesting someone on the staff of the patient's ward to make such arrangements for him or her. The Mental Hygiene Legal Service representative for this hospital may be reached at:

State of New York
Mental Hygiene Legal Service
Fourth Judicial Department
438 Main St Suite 400
Buffalo, NY 14202-3211 (716)845-3650

### General Information

Copies of any written request for a Court Hearing, along with a record of the patient, will be forwarded by the Director to the appropriate court and the Mental Hygiene Legal Service.

The Court Hearing will be held in the County in which the facility is located, unless a specific request for another location is made and is permitted by law.

You and other interested parties will be notified by the court as to the time and place of the hearing.

If you have any questions, feel free to ask any staff member of this facility for assistance.

ADM-LGL-027

# EXHIBIT H

FILED: ERIE COUNTY CLERK 09/09/2022 09:41 AM

NYSCEF DOC. NO. 4

INDEX NO. 810613/2022

RECEIVED NYSCEF: 09/08/2022

STATE OF NEW YORK
SUPREME COURT: COUNTY OF ERIE

In the Matter of the Application for Release of
Zakkiyya Carter,
                                    Petitioner

A Patient Admitted to
Erie County Medical Center Corporation
                                    Respondent

**ORDER**
[MHL §9.31]

Index No: 810613/2022

The petitioner having been confined at the above-named hospital pursuant to medical certification which expires on October 28, 2022, and having demanded a hearing on the question of need for involuntary care and treatment and a hearing having been held on September 7, 2022, and the petitioner having appeared via Microsoft Teams and by attorney, Samantha J. Ventura, Esq., of counsel to Elizabeth S. Fortino, Director, Mental Hygiene Legal Service, and respondent hospital having appeared by Steven C. Kos,, Esq., counsel to Magavern Magavern Grimm LLP, and the court having deliberated upon all papers and pleadings and testimonial evidence submitted by the parties,

And the hospital having proved to the satisfaction of the court by clear and convincing evidence that Zakkiyya Carter requires continued involuntary care and treatment, as that term is defined in the Mental Hygiene Law, and poses a danger to self or others;

And the Court adhering to the directives of the Administrative Order of the Hon. Kevin M. Carter, Administrative Judge of the 8th Judicial District of New York State on February 25, 2022, which provides for Mental Hygiene Law proceeding involving a hospitalized patient to be conducted virtually to the fullest extent possible, therefore this hearing was conducted via Microsoft Teams,

# EXHIBIT I

 Gmail

keke baby <thaqueen6262@gmail.com>

## JUDGE'S DECISION
2 messages

**LISA PAZDERSKI** <lgpaz@aol.com>                                    Tue, Feb 21, 2023 at 4:45 PM
Reply-To: LISA PAZDERSKI <lgpaz@aol.com>
To: "THAQUEEN6262@GMAIL.COM" <THAQUEEN6262@gmail.com>

Good Afternoon, Ms. Carter,

I am attaching Justice Feroleto's decision from 9/7/23 free of charge.

Please acknowledge receipt.

Thank you and good luck!

Lisa G. Pazderski
NYS Supreme Court Reporter

> **CARTERDECISION.pdf**
> 66K

**keke baby** <thaqueen6262@gmail.com>                               Tue, Feb 21, 2023 at 4:46 PM
To: LISA PAZDERSKI <lgpaz@aol.com>

Received, thank you.
[Quoted text hidden]

1

1    THE COURT:  You are welcome.  Okay.

2    Counselors, I'm going to deny Ms. Carter's request

3    for discharge at this time.  I feel the hospital

4    has proven their case.  And although the testimony

5    of Mr. Jefferson was proffered to say that he

6    didn't feel she has a psychiatric condition,

7    there's no evidence that he has any background in

8    identifying psychiatric conditions unlike

9    Dr. Ringel.  Thank you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT J

NEW YORK
STATE OF
OPPORTUNITY.

**Office of
Mental Health**

**Office Of Mental Health**
44 Holland Avenue
Albany, New York 12229

Ms. Zakkiyya Carter
280 Stevens Avenue
Buffalo, NY 14215

I am writing to formally request copies of documentation that bears my wet signature, specifically outlining that ZAKKIYYA CARTER was assigned to an authorized designee during the years of 2022 and any applicable years prior or following that assignment by an individual named "Kiesha." Additionally, I would like to request copies or documentation that confirms my assignment to a psychiatric case manager in the year 2022, the name, hospital or facility of said case manager. Thank you for your attention to this matter. I look forward to your prompt response.

Name: Zakkiyya Carter

Relevant Address in 2022: 323 Dewey Avenue, Buffalo NY 14215

Last Four of SSN: ▓▓▓

DOB: ▓▓▓▓▓▓

I would like copies sent electronically via email at the address attached to this correspondence. Thank you again.

Sent with Mixmax



Sent with Mixmax

Are you in crisis, experiencing emotional distress, or worried about someone you know? Call or text 988 or chat at 988lifeline.org 24 hours a day, 7 days a week.

This e-mail is IMPORTANT NOTICE: meant only for the use of the intended recipient. It may contain confidential information which is legally privileged or otherwise protected by law. If you received this e-mail in error or from someone who was not authorized to send it to you, you are strictly prohibited from reviewing, using, disseminating, distributing or copying the e-mail. PLEASE NOTIFY US IMMEDIATELY OF THE ERROR BY RETURN E-MAIL AND DELETE THIS MESSAGE FROM YOUR SYSTEM. Thank you for your cooperation.

## omh.sm.Centralfiles

| | |
|---|---|
| **From:** | keke baby <thaqueen6262@gmail.com> |
| **Sent:** | Wednesday, November 27, 2024 5:25 PM |
| **To:** | omh.sm.Centralfiles |
| **Subject:** | Re: REQUEST FOR RECORDS |
| **Attachments:** | image001.jpg |

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Received, thank you.

On Wed, Nov 27, 2024, 5:21 PM omh.sm.Centralfiles <Centralfiles@omh.ny.gov> wrote:

MyCHOIS

**From:** keke baby <thaqueen6262@gmail.com>
**Sent:** Wednesday, November 27, 2024 5:17 PM
**To:** omh.sm.Centralfiles <Centralfiles@omh.ny.gov>
**Subject:** Re: REQUEST FOR RECORDS

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Mailing Address: 280 Stevens, Buffalo, New York 14215

On Thu, Nov 14, 2024 at 11:23 AM keke baby <thaqueen6262@gmail.com> wrote:

---------- Forwarded message ---------
**From:** **keke baby** <thaqueen6262@gmail.com>
**Date:** Mon, Nov 11, 2024 at 9:24 AM
**Subject:** REQUEST FOR RECORDS
**To:** omh.sm.Centralfiles <centralfiles@omh.ny.gov>

1

**NEW YORK STATE OF OPPORTUNITY.** | **Office of Mental Health**

KATHY HOCHUL
Governor

ANN MARIE T. SULLIVAN, M.D.
Commissioner

MOIRA TASHJIAN, MPA
Executive Deputy Commissioner

*Dear General Requester:*

*Attached is a general request that was directly sent to our office. Unfortunately, this request cannot be processed because of the following items:*

☑   **Central Files had received your request for information.**
After an extensive search there is nothing that indicates that services were ever provided from our Agency. Therefore, this request cannot be processed. The entire packet of information that was forwarded to Central Files is being returned with this letter.

☐   **To request your medical information.**
Send the written request to the facility where treatment was received. Include the following data: reason for your request, Full name, Date of Birth, Social Security Number. You will hear back from the facility in writing as to the status of your request.

☐   **The information attached here to has been furnished at your request.**
**This information has been disclosed from confidential records which are protected uder the New York State Mental Hygiene Law, Section 33.13 and HIPAA regulations. These laws prohibit you from making any further disclosure of this infomration without the specific written consent of the person to whom it pertains, or as otherwise permitted state law.**
Any unauthorized further disclosure is a violation of state law and may result in a fine or jail sentenec or both. A general authorization of the release of medical or other information is not sufficient authorization for further disclosure.

☐   **This is to inform you that the missing persons process had changed.**
The new process is now automated and will allow you to enter data about the individual you are inquiring about directly in the program. Additional information on the system can be found at:
https://omh.ny.gov/omhweb/consumer_affairs/medicalrecords/ and find the Missing Person Link on the page or by going to  https://missing_persons.omh.ny.gov/ directly.

Once entered, if a match has been found, the facility's Executive Director will receive a request to communicate with the individual and will give the individual your contact information. Coordination of this communication is automatic. This program does not give you any information about the individual you are seeking. Permission will still be needed for any communication to occur. This system provides many enhancements and elimination of duplicative manual processes.

*Kind Regards,*

Kelly Shook (Tripp), RHIA
Chief Director, Medical Records Department
Central Files, Albany
Tel: 518-474-9793  Fax: 518-474-6275

# EXHIBIT K

Erie County Med. Ctr.
Patient Safety Check Report
MEDICAL RECORDS - MEDITOR
462 GRIDER STREET    BUFFALO, NEW YORK 14215
(716) 898-3000
PATIENT SAFETY CHECK REPORT

Patient: CARTER,ZAKKIYYA          Acct: #V00006980679          Report: #0902-0136



09/01/2022 17:09    JLOTT       Discharged           Discharged
09/01/2022 17:26    TMITCHELL   Own Room             Interacting/Socializing, With Staff
09/01/2022 17:45    TMITCHELL   Own Room             Sleep 3 Breaths Witnessed
09/01/2022 18:00    TMITCHELL   Own Room             Sleep 3 Breaths Witnessed
09/01/2022 18:10    AGORMAN2    Own Room             Resting
09/01/2022 18:23    AGORMAN2    5 Zone 4 Lounge      On Phone
09/01/2022 18:37    AGORMAN2    5 Zone 4 Lounge      On Phone
09/01/2022 18:52    AGORMAN2    Own Room             Resting
09/01/2022 19:06    MASARE      Own Room             Resting
09/01/2022 19:20    VLEVERENTZ  Own Room             Reading/Writing
09/01/2022 19:33    VLEVERENTZ  Own Room             Resting
09/01/2022 19:47    VLEVERENTZ  Own Room             Walking
09/01/2022 20:00    VLEVERENTZ  Own Room             Awake

```
                          Erie County Med. Ctr.
                       Patient Safety Check Report
                        MEDICAL RECORDS - MEDITOR
             462 GRIDER STREET    BUFFALO, NEW YORK 14215
                          (716) 898-3000
                     PATIENT SAFETY CHECK REPORT
--------------------------------------------------------------------------------
-------------------
Patient: CARTER,ZAKKIYYA          Acct: #V00006980679        Report: #0902-0136
--------------------------------------------------------------------------------
-------------------

09/01/2022 20:14   AGORMAN2     Own Room          Awake
09/01/2022 20:29   AGORMAN2     Own Room          Reading/Writing
09/01/2022 20:42   AGORMAN2     Own Room          Awake
09/01/2022 20:55   AGORMAN2     Own Room          Awake
09/01/2022 21:08   AMIRELES     Own Room          Other
09/01/2022 21:22   AMIRELES     Own Room          Reading/Writing
09/01/2022 21:37   AMIRELES     Own Room          Reading/Writing
09/01/2022 21:51   AMIRELES     Own Room          Reading/Writing
09/01/2022 22:05   AMIRELES     Own Room          Resting
09/01/2022 22:19   TMITCHELL    Own Room          Reading/Writing
09/01/2022 22:32   TMITCHELL    Own Room          Reading/Writing
09/01/2022 22:46   TMITCHELL    Own Room          Reading/Writing
09/01/2022 23:00   TMITCHELL    Own Room          Reading/Writing
09/01/2022 23:13   RDURHAM      Own Room          Awake
09/01/2022 23:28   RDURHAM      Own Room          Awake
09/01/2022 23:46   RDURHAM      Own Room          Resting
09/01/2022 23:59   RDURHAM      Own Room          Resting
```

Dictated by:    DATA IMPORT   09/01/22 2359
Signed by:      <Electronically signed by DATA IMPORT  in OV>
Sign date / time:  09/01/22 2359


09/01/22 2359 XXX

# EXHIBIT L



ECMC
462 GRIDER STREET
BUFFALO, NEW YORK 14215

AYH-PMM 14215

Ms. Zakkiya Carter
280 Stevens Ave.
Buffalo, NY 14215



ECMC    462 GRIDER STREET | BUFFALO, NEW YORK 14215    ECMC.EDU
(716) 898-3000 | (716) 898-5178 FAX

## REQUEST FOR AMENDMENT – 30 DAY EXTENSION LETTER

March 12, 2024

Ms. Zakkiyya Carter
280 Stevens Ave.
Buffalo, NY 14215

Dear Ms. Carter:

Regarding your request for an amendment of your Protected Health Information made on January 12, 2024, ECMC is requesting a one-time 30-day extension to respond to the request, due to the following reason(s):

Unable to reach responsible physician

ECMC will reply to your request no later than April 11, 2024. We do apologize for the delay and appreciate your understanding.

Very truly yours,

Brian Blamire
Administrative Clerk



# EXHIBIT M

**CERTIFIED MAIL®**

7018 1130 0000 1758 7889

Ms. Zakkiyya Carter
280 Stevens Ave.
Buffalo, NY 14215

14215:3737 C005

E C M G
462 GRIDER STREET
BUFFALO, NEW YORK 14215

ECMC    462 GRIDER STREET | BUFFALO, NEW YORK 14215     ECMC.EDU
        (716) 898-3000 | (716) 898-5178 FAX

April 11, 2024

Ms. Zakkiyya Carter
280 Stevens Ave.
Buffalo, NY 14215

Dear Ms. Carter:

Your request to Erie County Medical Center Corporation (ECMCC) to amend your Protected Health Information on January 12, 2024, along with a onetime 30-day delay letter dated March 12, 2024, has been denied for the following reason(s):

**The physicians that created the record are no longer on staff at ECMCC.**

You have the right to submit a written statement disagreeing with the denial. If you choose to do so, submit your statement to ECMCC's Health Information Management Department.

ECMCC will include your request for amendment and the denial in any future disclosures of your Protected Health Information.

You may file a complaint with ECMCC's Privacy Officer at 716-898-5880. You also may file a complaint with the Secretary of the U.S. Department of Health and Human Services. Please contact the Privacy Officer for contact information.

Very truly yours,

Brian Blamire
Administrative Clerk

